222 F.2d 781
 94 U.S.App.D.C. 353
 ALLENTOWN BROADCASTING CORPORATION, Appellant,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee, Easton
Publishing Company, Intervenor, WKAP, Inc., Intervenor.
ALLENTOWN BROADCASTING CORPORATION, Appellant,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee, WKAP, Inc., Intervenor.
 Nos. 11897, 11957.
 United States Court of Appeals District of Columbia Circuit.
 Argued Feb. 26, 1954.
Decided Aug. 19, 1954.
 
 [94 U.S.App.D.C. 354] Mr. Donald C. Beelar, Washington, D.C., with whom Messrs. Charles R. Cutler and Herbert J. Miller, Jr., Washington, D.C., were on the brief, for appellant. Mr. Reed T. Rollo, Washington, D.C., entered an appearance for appellant.
 Mr. Richard A. Solomon, Asst. Gen. Counsel, Federal Communications Commission, with whom Miss Mary Jane Morris, Counsel, Federal Communications Commission, was on the brief, for appellee. Mr. J. Roger Wollenberg, Asst. Gen. Counsel, Federal Communications Commission, at time brief was filed, was also on the brief for appellee.
 Mr. Eliot C. Lovett, Washington, D.C., for intervenor Easton Publishing Co.
 Mr. Stephen Tuhy, Jr., Washington, D.C., for intervenor WKAP, Inc.
 Before WILBUR K. MILLER, PRETTYMAN and BAZELON, Circuit judges.
 BAZELON, Circuit Judge.
 
 
 1
 This is an appeal from an order of the Federal Communications Commission granting the license application of the Easton Publishing Company for the assignment of a standard radio station at Easton, Pennsylvania, and denying that of Allentown Broadcasting Corporation for the same assignment at Allentown, [94 U.S.App.D.C. 355] Pennsylvania, 14 miles away.[1] It marks the third appearance of these parties before this court since their mutually exclusive applications were filed in 1945.[2]
 
 
 2
 When the Easton Company first appealed to this court from a June 1947 order of the Commission awarding the license to the Allentown applicant, we remanded the case 'for findings upon the comparative needs of the two communities for new radio service and the relative abilities of the applicants to serve the greater need.'[3] In February 1950, the Commission, rejecting a joint request for a final decision without further hearings, set aside the prior grant to Allentown, and reopened the record.[4] In March 1950, both applicants petitioned this court for writs of mandamus and prohibition directing the Commission to make a finding on the existing record. These petitions were denied on October 23, 1950,[5] and in March 1951, hearings in the reopened proceedings were commenced by the Commission.
 
 
 3
 Pursuant to our mandate, the Hearing Examiner made findings as to the comparative needs of the two communities, and the relative abilities of the applicants to serve the greater need. On the question of community need, the Hearing Examiner noted, inter alia, that Easton had only one standard broadcast station, whereas Allentown had three in addition to the one being operated by appellant under temporary authority of the Commission.[6] But in applying § 307(b) of the Communications Act of 1934,[7] which requires the Commission to provide a 'fair, efficient and equitable distribution of radio service * * *,' the Examiner also noted that Allentown had a population about three times that of Easton, and was growing at about four times the rate of Easton.[8] She concluded that the 'over-all evidence' showed a greater need for additional service in Allentown. For this reason, and because she viewed the record as casting grave doubt upon the reliability of the Easton applicant,[9] her Initial Decision recommended a grant to the Allentown company.
 
 
 4
 The Commission in the order now challenged reversed the finding of a greater need in Allentown, and set aside various findings reflecting adversely on the ability shown by the Easton applicant to serve its community's need. It found that both applicants proposed well-balanced program service, that slight differences between the two with respect to equipment, management and the like, fairly well canceled out,[10] and that 'considered separately' in terms of need for additional service of the type proposed by the applicants, 'there is little room [94 U.S.App.D.C. 356] for choice between the two communities.'[11]
 
 
 5
 In those circumstances of what it regarded as closely balanced community needs and applicant abilities, the Commission found the following to be the 'decisive factor' in compelling a grant of the additional facility to Easton:
 
 
 6
 '* * * Allentown is presently served by three standard broadcast stations located in and broadcasting local programs for that city, as well as receiving daytime service from the station located in adjoining Bethlehem, while only one standard broadcast station in located in and broadcast local programs for the Easton community. Thus, the residents of the Allentown community presently are afforded a choice between local standard broadcast programs and stations, a choice which can only be made available to the residents of the Easton community by means of an additional standard broadcast service.'
 
 
 7
 This 'choice of local service' principle is a gloss on § 307(b) of the Communications Act of 1934, supra. It was first applied by the Commission in Northwestern Ohio Broadcasting Corp.,[12] upon the crucial findings that the choice between the two communities was 'indeed a difficult one,'[13] and that both applicants 'propose(d) to render meritorious program services designed to meet the needs of the respective communities * * *.'[14] Since we affirmed on appeal because there was 'no error in the record,'[15] our approval of the 'choice of local service' principle was limited to its application in circumstances of otherwise approximately equivalent community need and applicant ability to serve such need. Although in the present case the Commission purported to find such equivalence, we think there is no substantial evidence in the record as a whole-- including the Hearing Examiner's Initial Decision-- to support the essential underlying finding that the ability of the applicants to serve their respective communities was about equal.[16] Hence, we hold the Commission's error is fatal to the order under review and requires that the case be remanded for reconsideration by the Commission.
 
 
 8
 We discuss three phases of the record which compel us to this view. They are: (1) Uncertainty as to programming plans; (2) Reluctance, evasiveness and lack of candor; and (3) monopoly and concentration of communications media.
 
 
 9
 (1) Uncertainty as to programming plans. At the 1946 hearing, the Easton applicant indicated that it would acquire a network affiliation if at all possible, and its proposed program schedule at that time included a number of network programs. But at the 1951 hearing, its proposed program schedule contained no network programs, and no mention was made of possible network affiliation on direct examination. On cross-examination, however, the general manager of Easton, first flatly denied any present intention to affiliate,[17] then spoke of a [94 U.S.App.D.C. 357] 'remote possibility that sometime in the indefinite future we might affiliate,'[18] and, finally, admitted that if licensed, 'we would probably explore the possibility' and if a desirable network affiliation were available would take affirmative steps to secure it.[19]
 
 
 10
 Although it is plain from this testimony that a network affiliation was contemplated, the Easton applicant, as the Hearing Examiner pointed out, offered no testimony as to 'what programs now proposed would be scrapped to make way for network programs.' Without such information, the Commission could not reasonably reach a conclusion in favor of the Easton Company on one of the crucial issues before it, namely, the Easton Company's ability to provide a choice of 'locally originating programs.'
 
 
 11
 (2) Reluctance, evasiveness, and lack of candor. The Hearing Examiner concluded that Easton's principal witnesses were reluctant, evasive, and had 'not made * * * frank, candid and honest disclosures * * *.' Although this conclusion was based in large part upon an evaluation of the demeanor, bearing, delivery, etc., of the Easton witnesses who appeared before the Examiner,[20] the Commission felt obligated to make an independent evaluation of the evidence because 'the Examiner's findings were primarily based on her evaluation of testimony by one witness rather than on her judgment as to the credibility of different witnesses who make contradictory statements * * *.' We cannot agree that the Examiner's findings are entitled to any less weight than findings[94 U.S.App.D.C. 358] which resolve a conflict between witnesses. Both involve a determination based upon an evaluation of the witnesses' demeanor, bearing and delivery; and it has been specifically held that the uncontradicted testimony of a single witness may be rejected on the basis of such made by the trier of fact who 'had the factors, and that this is a judgment best witnesses before it * * *.'[21]
 
 
 12
 The Commission, after independently examining the cold record, reversed the Examiner's findings and concluded that the testimony in question 'properly viewed, gives an overall appearance of consistency, candor and straightforwardness.'[22] But as Judge Learned Hand recently observed, '* * * we are not to be reluctant to insist that an examiner's findings on veracity must not be overruled without a very substantial preponderance in the testimony as recorded.'[23] We briefly describe certain matters appearing in the cold record which convince us that there is no such substantial preponderance in the present testimony.
 
 
 13
 (a) In connection with the question of a network affiliation, the Easton witness, as noted earlier, first spoke of the 'remote possibility * * * in the indefinite future' of a network affiliation, but later, under prodding, conceded that Easton would act affirmatively to acquire one if licensed.
 
 
 14
 (b) On direct examination, the President of the Easton Publishing Company testified that in addition to the Easton Express, which his company published, dailies published in Allentown, Bethlehem, Bangor (Pennsylvania), Newark, Plainfield (New Jersey), New York City, and Philadelphia circulated in the Easton area. On cross-examination it developed that the combined Easton area circulation of the Allentown and Bethlehem dailies was around 500, compared to 44,400 for the Express. We think the Examiner rightly concluded that the witness sought to create the misleading impression that his newspaper had substantial competition from the Allentown and Bethlehem dailies.[24]
 
 
 15
 It cannot be said that the evasiveness and lack of candor of Easton's witnesses related to matters of little consequence, for the Easton Company's monopoly position and the provision of locally-originating rather than network programs were issues of paramount importance in the proceedings before the Commission. In any event, as the Supreme Court has made clear, the importance of the matters concealed, obscured or evaded
 
 
 16
 [94 U.S.App.D.C. 359] '* * * is beside the point. The fact of concealment may be more significant than the facts concealed. The willingness to deceive a regulatory body may be disclosed by immaterial and useless deceptions as well as by material and persuasive ones. We do not think it is an answer to say that the deception was unnecessary and served no purpose.'[25]
 
 
 17
 (3). Monopoly and concentration of communications media. The Easton applicant publishes the only newspaper in Easton. It is the licensee of one of two FM radio stations, and of the only television station in that community. Such concentration of communications media has been viewed by the Commission as contrary to the public interest,[26] and this court has upheld that view.[27] Although recognizing that diversification of news sources is a 'public interest' factor, the Commission did not find it controlling here because (a) Easton's newspaper and radio operations would be substantially separate'; and (b) there was no evidence that Easton had used its newspaper ownership 'to attempt to obtain a monopoly over news sources * * *, or otherwise in a manner not in the public interest.'
 
 
 18
 At the hearing the general manager of the proposed Easton station, an employee of the Easton Publishing Company for 16 years, testified that he was assigned to 'this phase of the Easton Publishing Company activities' because for many years he had thought 'that a radio station would be a very, very valuable complement to our newspaper activities * * *.' He also testified that 'accounting and everything like that' for the FM station currently operated by the Easton applicant are handled by the Easton Express. This scarcely portrays a picture of 'substantially separate' operation.
 
 
 19
 There is no dispute that for twelve years, from 1936 to 1948, the Easton Express failed to carry the program logs for station WEST, the city's only standard broadcast station, although during that period it regularly carried the logs of the New York City network stations. While the Commission did not approve this practice, it felt that the change of heart since 1948 was 'some indication of the lack of an intention to freeze out WEST,' and concluded 'that the Easton Publishing Company is not disqualified to be a station licensee solely because of its newspaper ownership and activities.'
 
 
 20
 Such conduct may, of course, be a highly significant factor,[28] particularly when the offending applicant already enjoys a formidable control over communications media in the community. Whether the Commission considered this former practice in weighing the relative abilities of the competing applicants does not clearly appear from the record. But even if it did, it apparently deemed such conduct inconclusive in light of its findings that (1) the radio and newspaper operations would be 'substantially separate,' (2) Easton had not equivocated regarding its network affiliation and programming plans, and (3) its witnesses had presented consistent, candid, and straight-forward testimony. Since we hold these findings erroneous, the Commission must re-evaluate the effect of the Easton Company's news monopoly and its past conduct on the issue of the relative abilities of the two applicants to serve in the public interest. Upon such re-evaluation, these factors may [94 U.S.App.D.C. 360] well assume a different and perhaps decisive importance.
 
 
 21
 Contrary to appellant's contention, we think the Commission did consider existing or authorized FM and television facilities in Easton as bearing upon the relative needs of the communities for an additional AM facility.[29] Since operations under the television authorization did not commence until after the hearing, there is nothing in the record to show the extent to which actual operation has affected the need for an additional AM outlet for local self-expression in Easton. We are unwilling, however, in light of the protracted history of this controversy, to order a further hearing 'to bring the record up to date * * *.'[30]
 
 
 22
 We have considered other contentions advanced by appellant and find them without merit.
 
 
 23
 Reversed and remanded for a redetermination in accordance with this opinion.
 
 
 24
 PRETTYMAN, Circuit Judge, dissenting.
 
 
 25
 I disagree with my brethren in this case, and, because I fear that the opinion advances some unwise new law in the administrative field, I state the reasons for my dissent.
 
 
 26
 I think there is in this record no proper ground upon which a court can reverse the Commission. When this case was here the first time[1] the Commission had held a comparative hearing upon mutually exclusive applications for a radio license, made findings of facts, and awarded a license to one of the applicants. In practical effect the award was to one of two competing communities located just fourteen miles apart. In a unanimous opinion this court discussed at length the features of a choice between two well-qualified applicants. We passed upon several contentions attacking the Commission's award. In every instance, except one, we sustained the Commission. In that one instance the Commission had found that 'Allentown is in greater need of another radio station than Easton' and that the Allentown applicant was better qualified to meet that need, but it made no finding which would indicate why or how it reached those conclusions. Because of that lack, when the findings were attacked we could not tell whether they were arbitrary or not. For that lone reason we remanded the case. The opinion was quite explicit that the remand was to permit the Commission to make the missing findings as to the comparative needs of the communities and the relative abilities of the applicants to meet whichever was the greater need.
 
 
 27
 Upon the remand the Commission proposed to reopen the record for further evidence. Both applicants objected. They brought the matter back here. [94 U.S.App.D.C. 361] This court, again unanimously, held that it was the Commission's duty to award applications in satisfaction of public convenience, interest or necessity 'at the time of the award'. We declined to forbid the Commission's holding of further hearings. The hearings were held, and the Commission made findings. I have never seen more meticulous compliance with the requirements for findings by an administrative agency. There are sixty printed pages of them. They are full, understandable, and abundant in references to the evidence.
 
 
 28
 The reasoning upon which the Commission reached its ultimate decision is clearly stated and is fully justified by the record. After considering the applicants and the communities from every conceivable angle, it concluded that 'on the basis of most of the above factors and other considerations advanced by the applicants,' there was little room for choice. This was a natural and entirely proper conclusion. We had already remarked in the opinion upon the first appeal that to a disinterested eye two neighboring communities are often relatively the same in merit. The Commission continued: 'There is one decisive factor, however, * * *.' This was a proper and, indeed, highly commendable presentation of the view reached by the Commission. Many times two conflicting interests are well-balanced save for one decisive factor. It is the part of honesty to say so frankly, instead of weighting the factors which seem to favor the side which must win and deflating the loser's assets. In the case at bar the decisive factor was clearly and succinctly stated. It was:
 
 
 29
 'Allentown is presently served by three standard broadcast stations located in and broadcasting local programs for that city, as well as receiving daytime service from the station located in adjoining Bethlehem, while only one standard broadcast station is located in and broadcast local programs for the Easton community.'
 
 
 30
 If we can understand that conclusion, and if it is supported by the findings, and if the findings are supported by the evidence, our function as a reviewing court is nil. We cannot determine what is the public interest, etc., or where the balance between the applicants or the communities lies. We can only make sure that the Commission acted within its constitutional and statutory authority. I think it did so in this case, and I do not even formulate, much less express, any view upon the merit of its judgment. It, not the court, as the Supreme Court has frequently said, is the judge of the public interest. And it, not the court, has been empowered by the Congress to distribute radio licenses among the several states and communities. It cannot be arbitrary; a court will prevent that. But, if its conclusions on a comparative selection of a licensee are fairly found, a court has no power in the matter.
 
 
 31
 My brethren say there is no substantial evidence on the record as a whole 'to support the essential underlying finding that the ability of the applicants to serve their respective communities was about equal.' They specify the particulars in which they think the lack lies.
 
 
 32
 First. The court says that there is no substantial evidence on the record as a whole to support the Commission, in that the Easton applicant was uncertain as to its programming plans. The point centers about the testimony of a Mr. Rounsley. I do not read that testimony as my brethren do. It seems to me that the cross-examining attorney was trying to make the witness say things the cross-examiner wanted him to say but with which the witness did not agree. The witness insisted that, while Easton had no then-present plans for affiliation, it would, if it got the license, see what was available in the way of network affiliation and if a desirable one was available 'we would probably call them.' The cross-examiner tried to make him say that Easton did not intend to affiliate with a network, but the witness refused to say that. I see nothing indefinite [94 U.S.App.D.C. 362] about that testimony under the circumstances. Easton had not been on the air. The applications for the license had been pending six years. To hold extant a firm commitment from a network for that length of time would appear to me to be an amazing feat, and an unblushingly affirmative assertion about securing a network contract would seem to me to be pure and simple sales talk. On the other hand Allentown had been on the air since February, 1949, having been granted a license in the early stages of this proceeding. It had a network affiliation. At the hearing in 1951 Allentown was definite as to what it would do if it kept its license; it would continue to do what it was doing. Easton might well have been thinking that if it ousted Allentown from the disputed license it might take over Allentown's network contract.
 
 
 33
 To me it seems completely unrealistic to say that there is no substantial evidence in a record to support a finding of equal ability of two applicants because the applicant which had been operating under a license for two years was definite as to its program contracts while the applicant who was merely hoping at that stage and had to rely upon future events to make firm outside commitments was uncertain about them. If that is to be a policy the initial winner in the early rounds of one of these battles has a well-nigh insurmountable advantage over its rivals. The issue is ability-- not past performance but future ability. The court seems to say that, if the initial loser cannot be definite and firm as to his program contracts, there is no substantial evidence to support a finding that his ability is equal to that of his rival who has been on the air pendente lite. To me this part of the court's view is without substantial foundation and is erroneous in the processes of its reasoning.
 
 
 34
 Second. The court says that there was no substantial evidence on the record as a whole to support the Commission's finding, in that Easton's principal witnesses were reluctant, evasive, and lacked candor. The hearing examiner held to that effect; the Commission overruled her on the matter; the court says that the Commission erred, because certain matters convince the court that there was no substantial preponderance in the testimony against the trial examiner's view.
 
 
 35
 The court relies upon a statement by Judge Learned Hand in the Universal Camera case.[2] But Judge Hand was writing after the original decision in that case, supported by an opinion by him, had been reversed by the Supreme Court.[3] The natural frame of mind consequent to such circumstance moved Judge Frank to a delightful concurrence which throws much light upon the opinion of Judge Hand. The Labor Board had in that case reversed a finding made by one of its examiners. The Second Circuit was puzzled by the situation thus created but held that while the Board could not ignore an examiner's findings a reviewing court could not consider the Board's action in reversing the finding a factor in the court's own decision. The Supreme Court discussed the matter at length.[4] It held that an examiner's findings are not as unassailable as are a special master's under the Civil Rules;[5] that 'The 'substantial evidence' standard is not modified in any way when the Board and its examiner disagree'; that evidence may be less substantial when an examiner has rejected it than it is when he adopts it; that his findings 'are to be considered along with the consistency and inherent probability of testimony'; and that 'The significance of his report, of course, depends largely on the importance of credibility in the particular case.'
 
 
 36
 [94 U.S.App.D.C. 363] With the Supreme Court opinion on the point before us, we look at the case at bar. The examiner held that 'management officials' of Easton 'have been reluctant, evasive and evidenced a lack of candor'. She specified instances on the part of the president and general manager (one man) and said 'Other examples of evasiveness and lack of candor on the part of the general manager' of the proposed Easton station were considered, but I do not find what those examples were. Exception to the findings having been filed, the Commission considered them and failed to find the evasiveness and lack of candor the examiner found. The examples she cited, and which the court now discusses, are easy to consider upon the face of the record. They are not premised upon demeanor.
 
 
 37
 The first example is the program planning which we have discussed. I not only do not see evasiveness or lack of candor in it; the testimony seems fair, honest and complete to me. The second example is that the president of the company could not testify to the amount of the dividends declared in the year 1950. Here are the pertinent questions and answers, as they appear in the joint appendix before us:
 
 
 38
 'Q. Did the corporation declare dividends last year? A. Yes.
 
 
 39
 'Q. What was the size of the dividend?
 
 
 40
 '* * * A. I don't know that without checking the record.'
 
 
 41
 To me that testimony was not evasive and did not lack candor. Corporate officials testifying to a maze of figures, as this one was, frequently insist upon reference to the records for detailed figures as a matter of caution and accuracy. Indeed wise counsel forewarn witnesses against testifying by unrefreshed recollection on corporate statistics. If the object of the examination is the truth, the records are the best evidence. If the object is to test credibility, corporate statistics are not the field in which to do it. In the present case the records were available; indications are they were in the hearing room. I think the witness demonstrated commendable care.
 
 
 42
 The third example is that the president of the company testified to the published circulation figures of several newspapers which were circulated in the Easton area but upon cross examination it developed that the actual circulation of those papers in Easton itself was very small. The examiner said that by the direct testimony 'he created the impression that the Easton Express has substantial competition from the Allentown and Bethlehem daily newspapers', whereas, in fact, as he showed on cross examination, this competition did not exist. The question asked this witness on direct examination was prefaced by a remark by his counsel that in some prior hearing a question had been asked about the circulation of a Bethlehem, Pennsylvania, paper; the witness was asked if he had that figure. He replied that an association of newspapers published those figures, and he read the published figures for a number of newspapers into the record. His counsel then passed on to other matters. Opposing counsel picked up the subject and asked about the circulation figures in the Easton city zone. The witness read the figures from the same publication.
 
 
 43
 I note a few features of this episode. (1) No false statement is alleged to have been made. One counsel asked for some figures, and his opponent asked for more. All were truly given. (2) The nub of the present point is an impression on the part of the examiner that the witness attempted to create an impression. If it was an attempt by the witness it was not too smart an attempt. All the figures were apparently in the same publication, readily available to anybody. (3) The point was trivial. The Easton Press is the only paper published in Easton. How many out-of-town papers were sold there was of minimal importance. (4) Trial counsel generally will be startled to learn that, if they inquire about a subject and an opponent develops further facts about it, this court is of opinion [94 U.S.App.D.C. 364] that the failure of initial full development upon direct examination can, in the absence of any false statement, be used as a basis for reducing all the testimony on that side of the case to less than substantiality. I think so mighty a conclusion cannot properly be drawn from so tiny a premise.
 
 
 44
 So, when I examine the three examples given in support of the position that Easton's principal witnesses were reluctant, evasive, and lacked candor, which are instances easily checked on the written record, I find no substance whatever. As to other instances of evasion, etc., not identified by the examiner, I cannot consider them, because I do not know what they are. Neither does the court know.
 
 
 45
 My brethren say that the examiner's conclusions as to reluctance and evasion were based upon demeanor, bearing, delivery, etc., and in a footnote refer to the examiner's findings as to attitudes and impressions. This is a wide departure from the proper purpose and use of the demeanor test in respect to testimony as I understand it. The demeanor of a witness may be an indication whether he is or is not telling the truth. It is a reactor of credibility. But if a witness is telling the truth, his demeanor in telling it is no factor in its acceptability. The parade of witnesses is not a popularity contest. The truth need not fall trippingly from the lips; it may come haltingly, timorously, cautiously. But if it is the truth, the mannerisms of its delivery are no detraction. And so if a witness tells the truth, a hearing officer cannot say, 'To be sure, he told the truth but I got an impression that he would have liked to deceive me, and so I will not accept his statements.' The examiner in the case at bar did not such thing as that. She found evasion and lack of candor in what the witness did, not in how he did it. She rejected his testimony because of the substance of it, not because of the demeanor of the witness in the delivery of it. For example, in respect to the newspaper circulation incident, she found evasion in the fact that the witness on direct examination read into the record the total circulation figures but not the Easton area circulation. She did not find evasion because of his manner of reading. There is no question as to the truth of the figures he read. Whether he was myopic, unnecessarily cautious or meticulous, stuttered or spluttered was no part of her consideration, as I understand her reasoning. She found evasion because he read some figures and did not read others. The same observations apply to the other item mentioned by my brethren, the network plans. The evasion found by the examiner was in the substance of the testimony. She simply did not believe that the Company had made no plans. If the witness had said it with the charm of a television commercial, she still would not have believed it. Demeanor was not the index of the evasion; the substance of what was said was evasive in the examiner's view. I think the examples of alleged evasiveness in this case are precisely the sort which an agency can itself evaluate upon the record.
 
 
 46
 The Commission itself found no evasiveness and reversed its examiner's conclusions. The Supreme Court held in Universal Camera, supra, that the findings of the hearing examiner do not have to be clearly erroneous to be reversed by the agency. 'The responsibility for decision', said the Court, 'thus placed on the Board' is inconsistent with the clearly-erroneous requirement.[6]
 
 
 47
 This court reverses the Commission on this point because it finds no substantial preponderance in the evidence against the examiner's views. The court gets that rule, as I have pointed out, from Judge Hand's comment upon the Supreme Court opinion in Universal Camera. I am not sure what Judge Hand's statement means in the abstract, when read in the light of the Supreme Court's clear statement that an examiner's findings can be reversed by the agency for less [94 U.S.App.D.C. 365] than clear error. But I am sure that his statement does not deny the power of the agency in a case like the one before us. In the first place the lack of justification for the examiner's conclusions in the three instances she specified is as clear as a record can be. In the second place even the total of the three examples is no justification whatever for the blanket conclusion that there is no substantial evidence. The cited examples, even if accurately evaluated, are only small reeds; they are not footings for a heavy superstructure. I think my brethren are in flat conflict with the Supreme Court ruling when they reverse the Commission on these differences between the Commission and its hearing examiner.
 
 
 48
 Moreover the court seems to equate an agency's power to reverse its own examiner's finding with a reviewing court's power to reverse the agency's finding. It cites cases dealing with a court's power. This is interesting because in one cited Second Circuit case[7] Judge Frank cites and quotes from another Second Circuit opinion,[8] in which the court differentiated between 'testimonial inferences', based upon estimates of credibility, and 'derivative inferences', inferred from the testimony. The court may disregard the latter, said Judge Frank, and added: 'And we must disregard such a finding when the derivative inference either is not rational or has but a flimsy foundation in the testimony.'[9] The conclusions in dispute in the case at bar, as made by the trial examiner, were most truly 'derivative inferences', and moreover, to my way of thinking, had but flimsy foundations in the testimony. They could, and should, have been disregarded by the Commission. Furthermore I do not think the power of the court to reverse the agency is as extensive as is the power of the agency to reverse its examiner. That is the plain teaching of the Universal Camera case and also of the Administrative Procedure Act, as I read them. And such is the reasonable rule, because the whole rationale of administrative procedure rests upon findings by the agency, the body empowered by Congress to make the adjudication. Of course, in a disputed finding which depends upon demeanor, or upon some other feature better estimated by the person who sees the witnesses, observes their gestures, delays, etc., and hears their intonations, inflections ane emphases, that person is best able to resolve the dispute. But where findings are made from factual date, or factual statements, the responsibility for the action is upon the agency itself. In such instances it cannot be bound to make a finding which it does not believe to be accurate. In the case before us the alleged 'evasiveness' was not a matter of demeanor but a matter of factual substance of testimony.
 
 
 49
 Third. The court entitles this part 'Monopoly and concentration of communications media.' The facts are important. There is now only one standard broadcast station in Easton; it is not owned by the present applicant. Allentown has three standard stations. In respect to standard stations, therefore, the question is whether Easton should have a second station, bringing competition to a present monopoly, or Allentown should have four. Of course many other considerations enter, all as pointed out in our opinion in the first appeal. For example, Easton has two FM stations, one of which is owned by appellee, while Allentown has one operating and one under-consideration FM station. It is agreed that so far as receivers are concerned the FM broadcasts are a minor consideration. The point here is that the 'monopoly' feature is not a simple black-and-white problem.
 
 
 50
 In the next place the permissible amount of concentration of mass communication, involving broadcast stations and newspapers, is peculiarly a problem for the Commission. Here, indeed, is a [94 U.S.App.D.C. 366] regulatory problem. Ownership of a station by a newspaper can hardly be denounced per se. In the District of Columbia two of the four radio-television stations are owned by newspapers. In the instant case the Commission weighed many factors in this connection and produced a judgment on the point. I think the court should let it alone.
 
 
 51
 On the basis of the foregoing three considerations-- (1) indefiniteness of program plans, (2) evasiveness of witnesses, and (3) concentration of communication media-- the court concludes that there is no substantial evidence on the record as a whole to support the Commission's conclusion that the ability of Easton to serve its community is equal to the ability of Allentown to serve its community. I think, as I have indicated, that none of the three specifications has substance. I think, further, that the conclusion of the court does not follow from its specifications. Even if Easton's program plans were indefinite as to network affiliation, and its witnesses were evasive in the manner specified (network plans, unrefreshed recollection as to dividends, and the newspaper circulation matter), and the local newspaper would own one of the two standard radio stations, it does not follow that there is no substantial evidence of Easton's equal ability. There is ample evidence in the record on the point, as the fully documented findings readily show. The court does not merely differ with the Commission upon the relative evaluation of the applicants' abilities. It does not merely say there is less evidence in support of Easton than in support of Allentown. It strikes relative evaluation entirely from the case. It says there is no substantial evidence-- none-- in favor of Easton. It might be proper (although I would not agree with it) for the court to say that in view of the three specifications it is of opinion that the evidence of the ability of Easton is less than the evidence of the ability of Allentown. But it could not reverse the Commission on that basis. It can reverse only if there is no substantial evidence, on the record as a whole, to support the Commission's conclusion. The court finds no such evidence. I think its conclusion to that effect is not supported even by the three specifications it makes. It seems to me that the court is merely substituting its judgment for the judgment of the Commission as to which of these two applicants should have the license. It has no power to do that.
 
 
 52
 I would affirm.
 
 
 
 [1]
 The Allentown Corporation filed the appeal in case No. 11897 before the Commission acted upon its petition for rehearing; the appeal in case No. 11957 was filed after the Commission denied the petition for rehearing. Case No. 11897 is therefore dismissed as premature and we consider only the appeal in case No. 11957
 
 
 [2]
 By reason of the proximity of the two cities, simultaneous operation of the proposed stations would cause mutually destructive interference. Two other applicants for these facilities are no longer in the case
 
 
 [3]
 Easton Publishing Company v. Federal Communications Comm., 1949, 85 U.S.App.D.C. 33, 40, 175 F.2d 344, 351
 
 
 [4]
 Allentown was, however, permitted to continue the operation of its Station WHOL, a license for which was granted on February 2, 1949, and which had been built in accordance with a construction permit dated June 8, 1948
 
 
 [5]
 Easton Publishing Company v. Federal Communications Comm., 1950, 87 U.S.App.D.C. 344, 185 F.2d 987
 
 
 [6]
 See note 4, supra
 
 
 [7]
 48 Stat. 1084 (1934), as amended, 47 U.S.C.A. § 307(b)
 
 
 [8]
 Easton had a population of 33,589 in 1940 and 34,410 in 1950, an increase of 2.4%; Allentown's population in 1940 was 96,904 and in 1950 was 106,233, an increase of 9.6%. No significant change is introduced by making a comparison in terms of the built-up communities contiguous to the two cities
 
 
 [9]
 Initial Decision, Conclusion No. 37
 
 
 [10]
 Commission's Decision, Conclusion No. 12
 
 
 [11]
 Id., Conclusion No. 13
 
 
 [12]
 3 Pike & Fischer Radio Reg. 1945 (1948)
 
 
 [13]
 Id. at 1953, Conclusion No. 4
 
 
 [14]
 Id. at 1954, Conclusion No. 6
 
 
 [15]
 Sky Way Broadcasting Corp. v. Federal Communications Comm., 1949, 85 U.S.App.D.C. 425, 176 F.2d 951
 
 
 [16]
 Universal Camera Corp. v. National Labor Relations Board, 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456
 
 
 [17]
 'By Mr. Rollo:
 'Q. I notice in your analysis of Exhibit No. 84, your proposed program schedule, that you do not include any network programs on your proposed AM schedule. A. That is correct.
 'Q. That is your present plan, is it? A. That is the present plan.
 'Q. You no longer desire to affiliate with Mutual? A. There has been no conversation with Mutual in the past five years.
 'Q. You recall you originally testified you planned to affiliate with Mutual, do you not? A. I said we expected to discuss it with Mutual, but no arrangements have been made.
 'By Mr. Schildhause:
 'Q. Mr. Rounsley, you stated, did you not, that you had no current plans to affiliate your proposed AM station with the network? A. That is correct.'
 
 
 [18]
 'Mr. Rollo: Did you answer a question of mine to the effect that you did not intend to affiliate with the network?
 'The Witness: I did not say we did not intend to, I said we made no overtures at all. That is in the remote possibility that some time in the indefinite future we might affiliate.'
 
 
 [19]
 'The Presiding Officer: Mr. Rounsley, I am a little confused about this network proposition. I wish you would tell me what your plans are with respect to network. Now let us not talk about the dim distant future, let us talk about something not quite so far away
 'The Witness: If we have an AM facility we would probably explore the possibility of a network affiliation. We would naturally have to see what was available, what the terms are, something we do not know now, but we would explore that possibility.
 'The Presiding Officer: Am I to understand you would not wait for somebody to come to you?
 'The Witness: That is correct. In other words, we would have to have something to affiliate before we talk business.
 'The Presiding Officer: It is still not clear in my mind. Do you plan to sit by and wait for somebody to approach you, or what would be your procedure?
 'The Witness: I think we would probably see what was available, and after we saw what was available, if there was a network that we thought was desirable and available, we would probably call them.'
 
 
 [20]
 An examiner's findings 'based on that part of the evidence which the printed words do not preserve' are not ordinarily reviewable by the agency. Judge Learned Hand in National Labor Relations Board v. Universal Camera Corp., 2 Cir., 1951, 190 F.2d 429, 430. That the instant finding is not derived solely from evidence preserved in the printed record is illustrated by at least two findings of the Examiner. One Easton witness, she found, 'when * * * questioned * * * displayed an attitude of evasiveness and lack of candor on the subject (of Easton's plans for a network affiliation).' And she found that another witness, in testifying as to the circulation of newspapers in the Easton area, 'created the impression that the Easton Express (published by the applicant company) has substantial competition from the Allentown and Bethlehem daily newspapers.' Attitudes displayed and impressions created by a witness are usually demonstrated by hesitations, intonations and inflections of voice, gestures, etc., as well as by what appears in the printed record
 
 
 [21]
 Quock Ting v. United States, 1891, 140 U.S. 417, 422, 11 S.Ct. 733, 35 L.Ed. 501; National Labor Relations Board v. Howell Chevrolet Co., 9 Cir., 1953, 204 F.2d 79, 86, affirmed 346 U.S. 482, 74 S.Ct. 214; Zimmer v. Acheson, 10 Cir., 1951, 191 F.2d 209, 212. See National Labor Relations Board v. Dinion Coil Co., 2 Cir., 1952, 201 F.2d 484, 487-490, for an excellent historical discussion of the limited role of reviewing courts in evaluating 'demeanor evidence.'
 
 
 [22]
 Commission's Decision, Conclusion No. 4
 
 
 [23]
 National Labor Relations Board v. Universal Camera Corp., 2 Cir., 1951, 190 F.2d 429, 430. See also United States Steel Co. v. National Labor Relations Board, 7 Cir., 1952, 196 F.2d 459, 467; Ohio Associated Tel. Co. v. National Labor Relations Board, 6 Cir., 1951, 192 F.2d 664, 668
 While the Universal Camera case involved the judicial review provision of the Labor Management Relations Act, 1947, 61 Stat. 148, 29 U.S.C.A. § 160(e), the Supreme Court held that these provisions are equivalent to the judicial review provisions of the Administrative Procedure Act, 60 Stat. 243-244 (1946), 5 U.S.C.A. 1009(e), which apply to the instant proceeding. Universal Camera Corp. v. National Labor Relations Board, 1951, 340 U.S. 474, 487, 71 S.Ct. 456, 95 L.Ed. 456.
 
 
 [24]
 Another example, which, if less significant, is nonetheless revealing, is the professed inability of the President of the Easton applicant to state the amount of dividends paid by his company for 1950. Since he had been with the company for 33 years, had attended weekly directors' meetings, and in addition to being president, was treasurer and a stockholder of the company, his claimed ignorance does not appear credible
 
 
 [25]
 Federal Communications Comm., v. WOKO, Inc., 1946, 329 U.S. 223, 227, 67 S.Ct. 213, 215, 91 L.Ed. 204
 
 
 [26]
 See, e.g., WSMB, Inc., 5 F.C.C. 55 (1938); R. R. Jackman (WREN), 5 F.C.C. 496 (1938); Louisville Times Co., 5 F.C.C. 554, 559 (1938)
 
 
 [27]
 Scripps-Howard Radio, Inc. v. Federal Communications Comm., 89 U.S.App.D.C. 13, 19, 189 F.2d 677, 683, certiorari denied, 1951, 342 U.S. 830, 72 S.Ct. 55, 96 L.Ed. 628; Plains Radio Broadcasting Co. v. Federal Communications Comm., 1949, 85 U.S.App.D.C. 48, 52, 175 F.2d 359, 363
 
 
 [28]
 Cf. Mansfield Journal Co. v. Federal Communications Comm., 1950, 86 U.S.App.D.C. 102, 109, 180 F.2d 28, 33
 
 
 [29]
 See Easton Publishing Co. v. Federal Communications Comm., 1949, 85 U.S.App.D.C. 33, 38-40, 175 F.2d 344, 349-351
 
 
 [30]
 Interstate Commerce Comm. v. Jersey City, 1944, 322 U.S. 503, 514, 64 S.Ct. 1129, 1134, 88 L.Ed. 1420. The Court observed: 'Administrative consideration of evidence-- particularly where the evidence is taken by an examiner, his report submitted to the parties, and a hearing held on their exceptions to it-- always creates a gap between the time the record is closed and the time the administrative decision is promulgated. This is especially true if the issues are difficult, the evidence intricate, and the consideration of the case deliberate and careful. If upon the coming down of the order litigants might demand rehearings as a matter of law because some new circumstance has arisen, some new trend has been observed, or some new fact discovered, there would be little hope that the administrative process could ever be consummated in an order that would not be subject to reopening.'
 See also Communications Act Amendments, 1952, § 14(h), 66 Stat. 720 (1952), 47 U.S.C.A. § 402(h), providing that 'unless otherwise ordered by the court * * *,' the Commission shall give effect to the judgment of the court reversing an order of the Commission 'upon the basis of the proceedings already had * * *.'
 
 
 [1]
 Easton Pub. Co. v. Federal Communications Comm., D.C.Cir., 1949, 85 U.S.App.D.C. 33, 175 F.2d 344
 
 
 [2]
 National Labor Relations Bd. v. Universal Camera Corp., 2 Cir., 1951, 190 F.2d 429
 
 
 [3]
 Universal Camera Corp. v. Labor Bd., 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456
 
 
 [4]
 Id., 340 U.S. at pages 492-497, 71 S.Ct. 456 at pages 467-469
 
 
 [5]
 A master's findings are reversible only if clearly erroneous. Fed.Rules Civ.Proc. rule 53(e)(2), 28 U.S.C.A
 
 
 [6]
 Supra note 3, 340 U.S. at page 492, 71 S.Ct. at page 467
 
 
 [7]
 National Labor Relations Board v. Dinion Coil Co., 2 Cir., 1952, 201 F.2d 484
 
 
 [8]
 American Tobacco Co. v. The Katingo Hadjipatera, 2 Cir., 1951, 194 F.2d 449
 
 
 [9]
 Id., 194 F.2d at page 451