**Jose LUGO, Plaintiff,**

v.

**John W. GARDNER, Secretary of Health, Education and Welfare, Defendant.**

**No. 65 Civ. 1859.**

United States District Court
S. D. New York.

April 25, 1966.

Rolnick, Ezratty & Huttner, New York City, for plaintiff, Richard D. Huttner, New York City, of counsel.

Robert M. Morgenthau, U. S. Atty., for Southern Dist. of New York, New York City, for defendant, Judith N. Stein, Asst. U. S. Atty., of counsel.

FRANKEL, District Judge.

Plaintiff sues under Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g), for review of an administrative decision denying his claim under Sections 216(i) and 223, 42 U.S.C. §§ 416(i) and 423,[1] for disability

---

1. 42 U.S.C. § 423(c) (2), during the times with which we are concerned, defined the term "disability" to mean "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or to be of long-continued and indefinite duration." The same definition appeared in 42 U.S.C. § 416(i). This definition and other aspects of the statute were amended by Title III of the Social Security Amendments of 1965, 79 Stat. 286, 361 et seq. (see the 1965 Cumulative

insurance benefits. The Secretary, having filed the administrative record in accordance with the statute, has moved for judgment on the pleadings. Plaintiff, while he makes no cross-motion, attacks the agency's ruling as arbitrary, capricious, and unsupported by the requisite substantial evidence. The opposing submissions are sufficient to mobilize the court's power under 42 U.S. C. § 405(g) "to enter * * * a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing." [2]

## I.

Plaintiff is now in his fiftieth year. He was born in Puerto Rico, where he had his only formal schooling lasting slightly over two years. He went to sea when he was about fifteen, serving as a messman. His career as a seaman lasted for about thirty years, both as a messman and then as a cook, until in 1961 he was declared unfit for sea duty by the United States Public Health Service and was granted a disability pension by the National Maritime Union.

Whatever his ultimate rights may be under the Social Security Act, plaintiff has not enjoyed good health for a long time. He was hospitalized by the Public Health Service in 1958 for pruritus, an intense itching, and found then to be suffering from diabetes mellitus and Laennec's cirrhosis. From December 9, 1960, to January 6, 1961, he was once again in a Public Health Service hospital because his diabetes was out of control. In his summary at the time of discharge, the treating physician reported that the diabetes had been manageable while plaintiff was in the hospital, but had flared up again when he was allowed to go out on pass. The physician concluded:

"* * * [W]e had gotten no where [sic] in teaching this man about the importance of his diet. Consultations with the dieticians to help out on this problem were performed but to no avail. I do not honestly believe that this man will ever control his diabetes adequately."

Plaintiff was then declared unfit for sea duty, but the recommendation added: "If he has been running negative urines during the week, he will then be made fit for duty."

From that time until May of 1961, plaintiff passed four more sojourns in the Public Health Service hospital. At the end of May, the Service physicians concluded that his cirrhosis and diabetes rendered him permanently not fit for duty. He has never gone to sea since.

In addition to diabetes and cirrhosis, plaintiff suffers from prostatitis, general weakness, nausea, occasional seizures, and fatigue after mild exertion. Following an examination ordered by the agency in August 1963, an internist also reported arteriosclerotic heart disease. Another medical report mentions chronic bronchitis. Since 1963 his records show diabetes "with neuropathy" and a diagnosis of "anxiety."

For the view we take of the problem before us, it seems unnecessary to extend the account of plaintiff's physical afflictions and constant needs for medical attention. The central issue we find, as will appear presently, relates to the agency's views as to whether plaintiff can or should control his diseases, and whether his condition in this respect bars his claim for benefits. Accordingly, it becomes pertinent to note what the record shows on this subject.

As mentioned earlier, a Public Health Service physician in May 1961 despaired of ever teaching plaintiff to manage his diabetes on his own. Other physicians made relevant observations on this subject. He was described by a doctor in August 1961 as being "not physically

Annual Pocket Part of 42 U.S.C.A.). The parties have not suggested, and we have not observed, any respects in which the amendments affect the instant case.

2. See the second sentence of Rule 12(c), Fed.R.Civ.P.; 6 Moore, Federal Practice ¶ 56.12 (2d ed. 1965).

fit and out of contact." A 1963 report—evidently reflecting awareness of plaintiff's meager education, limited literacy, and bleak economic circumstances—said in sketchy notes that plaintiff's diabetes was "not under control as should due to poor cooperation due to social and economic problems do not follow diet * * * as ordered. * * *" In July of 1964, another internist retained by the agency wrote that plaintiff's diabetes was

> "poorly controlled, probably due to lack of patient cooperation. * * * With proper education and cooperation of the patient, the diabetes should offer no difficulties. * * * I believe the above conditions are amenable to medical management, given patient cooperation, and that this patient could be rehabilitated within a matter of a few months."

Similar questions are touched by the record in connection with plaintiff's cirrhosis. It appears that this malady was caused years ago, or at least nourished, by his use of alcohol. The matter is left somewhat uncertain in the agency's final decision, but the great weight of evidence supports plaintiff's claim of teetotalism for some years.

## II.

Plaintiff applied for disability benefits on May 29, 1961, after the Public Health Service had declared him unfit to go to sea. The application was denied on January 20, 1962, and plaintiff sought no hearing at that time.

The new application which has led to the present litigation was filed on July 10, 1963.[3] When this was denied in September 1964, plaintiff exercised his right to demand a hearing. The hearing was granted and plaintiff—without counsel or other assistance, and coping somewhat feebly with the English language [4]—appeared before a Hearing Examiner on September 25, 1964. In the transcribed proceedings that followed, lasting about an hour and a half, the Examiner courteously but pointedly inquired about plaintiff's own efforts to cope with his illnesses. Plaintiff swore he had avoided liquor for three or four years. Though his testimony is less clear on the subject, he appears also to have satisfied the Examiner that he paid attention to the dietetic restrictions indicated by his diabetes.[5]

In his report of January 25, 1965, which he described as "wholly favorable to the claimant," the Examiner decided that plaintiff was "entitled to disability insurance benefits and to a period of disability" dating from September 1, 1961.

In a letter dated February 25, 1965, the Administration's Appeals Council notified plaintiff that it had decided on its own motion to review the Hearing Examiner's decision. Explaining this action, the letter said:

> "It is believed that further study should be made regarding the extent to which your health can be improved by the following of a proper medical program."

Plaintiff was given an opportunity, which he appears not to have seized, to present further evidence or appear in person or by representative in Washington, D. C., for an oral presentation of his case.

Except for a two-page summary of plaintiff's medical history it ordered from the Public Health Service, the Ap-

---

3. It is not disputed that plaintiff's eligibility for benefits, assuming he could show the requisite disability, endured through September 30, 1963.

4. The Examiner interrupted the hearing at one point to say: "Let the record show that the claimant is inarticulate, speech is difficult to understand. He rambles in his discussion. He is unresponsive to the questions asked."

5. The matter was mentioned at two separate times in the hearing (Tr. 32, 35), as follows:

> "Q. Do you have to watch what you eat?
> "A. Well, sometimes, I think, but—
> *       *       *       *       *
> "Q. Well the doctors say that you don't follow your diet.
> "A. Well I follow it a lot, do what he told me."

peals Council considered plaintiff's case on the exhibits that had been before the Examiner and the transcript of the hearing conducted by him. It reversed the Examiner and entered the final decision of rejection against which the present action is brought.

Having been concerned from the outset with whether plaintiff's health could be "improved by the following of a proper medical program", the Council made this a central subject in reaching its conclusions. It noted that plaintiff "has been instructed about the necessity for following an appropriate diet for the purpose of controlling the diabetes." It reviewed the observations we have mentioned by physicians opining that plaintiff would be better off if he were more careful. It quoted, and undertook to apply, the agency's regulation, 20 C.F.R. § 404.1502(g), providing:

"An individual will be deemed not under a disability if, with reasonable effort and safety to himself, the impairment can be diminished to the extent that the individual will not be prevented by the impairment from engaging in any substantial gainful activity."

Concluding that plaintiff was not attending properly to his diabetes, the Council also expressed some doubt about his claim of strict temperance. It said:

"The Appeals Council recognizes that the claimant had repeatedly denied the continued use of alcohol and notes that lack of evidence of a progressing liver disease as well as the possibility of other gastrointestinal causes for these symptoms militates against a conclusion that the claimant has been as non-cooperative with the physicians who treated his liver disease as he has been with those who were treating his diabetes. Nevertheless, such an inference cannot be dismissed completely."

The Council made explicit its judgment that plaintiff was disabled, but that it was his own fault:

"There can be no doubt that the claimant's diabetes and cirrhosis are amenable to treatment, have not resulted in significant complications, and that with better cooperation with his doctors, *he could reasonably be expected to improve to the point where he could engage in substantial gainful activity in a variety of jobs.*" (Emphasis added.)

Similarly, in the first two of its five formal "Findings," the Appeals Council stated that plaintiff's diseases are (1) "amenable to medical management" and (2) subject to substantial disappearance "[w]ith adherence to medical advice, particularly as to diet and appropriate medication. * * *"

### III.

Proceeding on a paper record, and reversing the Hearing Examiner who saw and heard the plaintiff, the Appeals Council found that plaintiff's sicknesses would become far less disabling if he took proper care of himself. Standing alone, this judgment is debatable but not assailable within the confines of the limited power of judicial review. The Hearing Examiner, presumably following the regulations, and after specifically inquiring on the subject, evidently believed plaintiff when he said he was following doctor's orders. The Appeals Council could and did prefer to credit the contrary reports of treating and examining physicians. We would sanctify unduly the role of demeanor evidence if we held the agency bound more tightly to its Examiner's judgment. Cf. Allentown Broadcasting Corp. v. Federal Commun. Comm., 94 U.S.App.D.C. 353, 222 F.2d 781, 790–793 (1954) (dissenting opinion), reversed, 349 U.S. 358, 363–364, 75 S.Ct. 855, 99 L.Ed. 1147 (1955); Blatt, "He Saw the Witnesses," 38 J.Am. Jud. Soc'y 86 (1954).

Moreover, we do not question (nor does plaintiff) the validity of the agency's regulation precluding a finding of disability when the claimant, "with reasonable effort and safety to himself," is able to become fit for substantial gainful employment.

We conclude, however, that in applying the regulation, the Appeals Council

followed an abstract, mechanical, and impersonal standard that does not adequately measure its duty to disability benefits claimants.

The Council has said in effect that a rational man with plaintiff's symptoms would arrange to suffer far less from the diabetes and cirrhosis comprising his major, though by no means his only, sources of disablement. What the Council has failed to do is even to ask, let alone to say, why *this plaintiff* is so imprudent, and how the answer to this question may affect his claim.

The courts have observed more than once—and the Social Security Administration undoubtedly demonstrates in the thousands of cases that never get to court—that the statutory benefits are to ease the infinitely variable burdens of individual people. In treating the myriad situations that are primarily for the administrators, "the abstract 'average' man is not the criterion. The inquiry must be directed to the particular claimant; not to people in general or even claimants in general." Thomas v. Celebrezze, 331 F.2d 541, 545 (4th Cir. 1964); see also Pollack v. Ribicoff, 300 F.2d 674, 677 (2d Cir.1962); Dvorak v. Celebrezze, 345 F.2d 894, 895 (10th Cir. 1965). This is true generally in determining whether the claimant meets the test of inability to "engage in any substantial gainful activity * * *." The tests are not "objective" or general; they are subjective and particular. The claimant who asserts he is racked with totally disabling pain is not adequately answered when he is told that "normal" people could bear his objectively determined diseases with relative equanimity. The hard question every time is whether the concrete person claiming the Act's benefits is suffering "pain so very real to [him] and so intense as to disable [him.]" Ber v. Celebrezze, 332 F.2d 293, 296, 298–300 (2d Cir.1964); see also Miracle v. Celebrezze, 351 F.2d 361,

374 (6th Cir.1965); Mark v. Celebrezze, 348 F.2d 289, 292 (9th Cir.1965).

The small record is filled with unresolved uncertainties on the question the Appeals Council undertook to study and answer. A Public Health Service doctor despaired of "teaching this man about the importance of his diet." Another said plaintiff's "social and economic circumstances" accounted for his self-destructive menus. There are reports that plaintiff has been "out of contact," afflicted with "anxiety," "depressed and resigned to his condition." An impatient physician says that plaintiff's sufferings will end with "proper education and cooperation of the patient," and that, "given patient cooperation, this patient could be rehabilitated within a matter of a few months." But we are not hold how feasible it is to expect the "cooperation" or why it has not been forthcoming.

On the record before us it is possible only to suggest, without attempting to answer, some obvious questions. Is the plaintiff malingering? Would he rather be sick than work? Would he "cooperate" if there were no economic rewards for his physical miseries? Is he emotionally, psychologically, intellectually capable of following the prescriptions that are said to promise better health?

Though they are not psychiatrists, even judges are required to know that men are not uniformly rational. We are entitled to notice, if we cannot judge professionally, the teachings that many people are grievously ill because they are truly "disabled" to follow seemingly simple measures that would cure or improve them. We are permitted to know that the medical literature abounds with reports that psychic factors account commonly for the poor regulation of diabetes.[6] And we know that the Social Security Act and the regulations under it define "disability" to include "medically determinable physical *or mental* impairment * * *." 42 U.S.C. § 423

6. See Cecil-Loeb, Textbook of Medicine 1298, 1308 (11th ed. 1963); Harrison (ed.), Principles of Internal Medicine 650 (4th ed. 1962); Weiss and English, Psychosomatic Medicine 521–39 (2d ed. 1949).

(c) (2) (emphasis added); and see 20 C.F.R. §§ 404.1501, 404.1502(a), 404.-1510; Ber v. Celebrezze, supra, 332 F.2d at 299.

The Appeals Council has not adequately made—or, at least has not adequately reported—the "further study," for which it opened the Examiner's favorable decision, "regarding the extent to which [plaintiff's] health [could] be improved by the following of a proper medical program." We have suggested some questions that seem to us to require answers. We would not claim that these are the only questions, or even that they are precisely correct as we have formulated them. For problems like this, at least in the first instance, the right questions as well as the right answers are for the administrators. "The examiners who hear these cases are, after all, specially skilled in bringing together the medical, psychological, historical, educational and economic data on disability claimants and arriving at judgments as to their qualifications for benefits under the Act." Goodwin v. Gardner, 250 F. Supp. 454, 459 (N.D.Calif.1966).

In the end, we hold only this: the claim may not lawfully be denied solely on the ground that proper medical care, coupled with prescribed measures by plaintiff, would mitigate his disabilities. If the claim is to be rejected for such a reason, it must be because it is "reasonable"—considering the beneficent purposes of the statute and the regulation invoked by the Appeals Council, along with the concrete circumstances of the claimant's age, education, emotional condition, intelligence, and environment —to conclude that he is in fact able (not "disabled") to take the prescribed meas-

ures. But cf. Thompson v. Flemming, 188 F.Supp. 123 (D.Ore.1960). In the consideration of this question, we doubt that the burden of proof ought to be upon the indigent claimant. Cf. Kerner v. Flemming, 283 F.2d 916, 921–922 (2d Cir.1960). Where a claimant has shown the statutory degree of disability in his existing condition, the question whether he could reasonably mitigate his sufferings has the sound of an affirmative defense. At least in the particular circumstances of this case, where the Appeals Council chose of its own volition to launch the "study," it does not seem too much to demand that no less than a preponderance of the evidence should justify reversing the Examiner.

Of course, it is to be hoped in the last analysis that the grant or denial of disability benefits, under a statute calling for liberal construction (see, e. g., Dvorak v. Celebrezze, supra, 345 F.2d at 897), will not be determined on the kind of jeweler's-scale calculations called to mind by notions about the burden of proof.[7] What is wanted is "substantial evidence" and a lawfully reasoned judgment showing whether Mr. Lugo, viewing him and his illnesses in the light of what the agency can reasonably know about the circumstances that make him the way he is, should be deemed "disabled" within the statute's meaning.

The agency's order is reversed and the matter is remanded for reconsideration, and such further proceedings as the Secretary may deem appropriate, in accordance with this opinion. Cf. Stephens v. Ribicoff, 307 F.2d 304, 306 (4th Cir.1962); Kerner v. Flemming, 283 F. 2d 916 (2d Cir.1960).

So ordered.

7. We have been led to touch on the burden of proof by the Appeals Council's observations concerning plaintiff's cirrhosis. On that subject plaintiff's sworn testimony and considerable medical evidence indicated that he had shunned strong drink for some years. The Appeals Council observed that such evidence "militates against a conclusion that the claimant has been as non-cooperative with the physicians who treated his liver disease as he has been with those who were treat- ing his diabetes." Then, having noted that one report suggested the opposite possibility, the Council added: "Nevertheless, such an inference [of "non-cooperation"] cannot be dismissed completely." On the record as we read it, the inference seems less tenacious. Furthermore, we trust that a claimant is not to be denied because an inference adverse to him, like most inferences, resists "complete" dismissal.