**EASTON PUB. CO. v. FEDERAL COMMUNICATIONS COMMISSION (ALLENTOWN BROADCASTING CORPORATION et al., Intervenors).**

No. 9829.

United States Court of Appeals
District of Columbia Circuit.

Argued Nov. 18, 1948.

Decided May 4, 1949.

Mr. Eliot C. Lovett, Washington, D. C., for appellant.

Mr. Richard A. Solomon, Counsel, Federal Communications Commission, Washington, D. C., with whom Mr. Benedict P. Cottone, General Counsel, Federal Communications Commission, Mr. Max Goldman, Acting Assistant General Counsel, Federal Communications Commission, and Miss Mary Jane Morris, Counsel, Federal Communications Commission, Washington, D. C., were on the brief, for appellee. Mr. Paul Dobin, Counsel, Federal Communications Commission, Washington, D. C., also entered an appearance for appellee.

Mr. Donald C. Beelar, Washington, D. C., with whom Messrs. Louis G. Caldwell and R. Russell Eagan, Washington, D. C., were on the brief, for intervenor Allentown Broadcasting Corporation. Mr. Reed T. Rollo, Washington, D. C., also entered an appearance for intervenor Allentown Broadcasting Corporation.

Messrs. Geo. O. Sutton, William Thomson and John H. Midlen, Washington, D. C., entered appearances for intervenor Associated Broadcasters, Inc.

Before STEPHENS, Chief Judge, and PRETTYMAN and PROCTOR, Circuit Judges.

PRETTYMAN, Circuit Judge.

This is an appeal from a decision of the Federal Communications Commission.[1] Four applications for an unlimited-time standard broadcast station[2] in the general area of Allentown-Easton, Pennsylvania, were made to the Commission. The various applications were mutually exclusive. They

---

[1] Sec. 402(b) (1) of the Communications Act of 1934, 48 Stat. 1093, 47 U.S.C.A. § 402(b) (1).

[2] Three were for new construction, and one was for a change in the frequency of an existing station.

were consolidated for hearing, evidence was taken, and a proposed decision was promulgated. *Exceptions were entered, briefs were filed, and oral argument was presented.* Thereafter the Commission announced its findings of fact, conclusions and decision. Petition for rehearing was filed and denied, a memorandum opinion accompanying the final order.

The successful applicant was the Allentown Broadcasting Corporation. Appellant is the Easton Publishing Company. Allentown and Easton are rival cities, so far as this proceeding is concerned, located fourteen miles apart.

The controversy hinges upon that section of the statute [3] which provides:

"In considering applications for licenses, and modifications and renewals thereof, when and insofar as there is demand for the same, the Commission shall make such distribution of licenses, frequencies, hours of operation, and of power among the several States and communities as to provide a fair, efficient, and equitable distribution of radio service to each of the same."

Each of the two cities here involved is surrounded by a built-up community of some size. Allentown is about three times the size of Easton, by various standards of measurement, and the same approximate proportion holds if the respective communities are also considered. Allentown already has one standard broadcast station of unlimited time, with 5,000 watts (5 kw.) power. Easton also has one, with 250 watts power. Allentown has, or has under authorization, two more daytime-only stations. Easton gets primary service in the daytime from a New York station.

The case involves a comparative consideration of two communities and of two applicants. In the growing field of radio broadcasting, as more and more frequencies become available and more and more mutually exclusive applications are filed, these comparative hearings and judgments assume greater and greater importance. It is important that the procedural essentials for the cases be established, so that the Commission may proceed with certainty upon its tasks, the courts may perform their review functions without unnecessary impediment to the expeditious disposition of the cases, and potential applicants for licenses and parties to the disputes may know with all possible certainty what the applicable rules are.

The Supreme Court made clear in its opinion in Federal Communications Comm'n v. Sanders Bros. Radio Station [4] that Congress intended to make broadcasting a competitive business, and that the usual rules relating to the certification of public utilities do not apply. It said (309 U.S. at 475, 60 S.Ct. at page 697, 84 L.Ed. 869): "In short, the broadcasting field is open to anyone, provided there be an available frequency over which he can broadcast without interference to others, if he shows his competency, the adequacy of his equipment, and financial ability to make good use of the assigned channel." Under that view of the statute, the public interest, convenience and necessity to which the Act refers are served by effective competition among strong competitors. Competition, of course, is between broadcasters on different frequencies covering the same area. If there be only one applicant for a given frequency in a given area, the community need for a new station and the relative ability, above the minimum requirements, of the applicant to render service are immaterial. But, if a choice must be made between two qualified applicants, the problem has a different aspect. And, if a choice must be made between two communities, still further considerations are involved. In the latter case, the public interest and an equitable distribution of service may well require a determination of the relative needs of the communities for more service and the relative abilities of the applicants to meet the greater need. In Johnston Broadcasting Co. v. Federal Communications Comm'n, 175 F.2d 351, decided today, we have reaffirmed, in respect to comparative determinations, the requirements laid down in Saginaw Broad-

[3] Sec. 307(b) of the Communications Act of 1934, 48 Stat. 1083, as amended, 49 Stat. 1475 (1936), 47 U.S.C.A. § 307 (b).

[4] 1940, 309 U.S. 470, 60 S.Ct. 693, 84 L.Ed. 869.

casting Co. v. Federal Communications Comm.[5] and Tri-State Broadcasting Co. v. Federal Communications Comm.[6] as essential to valid administrative orders. The present case presents a further phase of the same problem.

The requirement of the statute that the decision of the Commission be not arbitrary is as vital in a choice between communities or applicants as it is in the ascertainment of bare qualifications for a license. Indeed, the need for well-founded judgment in a comparative consideration may be even greater, from the practical point of view, than is such need in a mere affirmation of minimum qualities. If an applicant has not the bare minimum qualifications for a license, no great harm is done by its denial. But a choice between two well-qualified applicants necessarily means a substantial economic denial as well as an economic award. And, in respect to competing communities, the award means denial to one as it means advantage to the other.

The requirement that a choice be premised upon findings of fact which make clear the reason for the choice and make the choice a rational conclusion from the facts, sometimes presents difficulty, because, conceivably, there may be little difference in fact between applicants or between communities. Indeed, it is possible that to an outsider's eye there is no distinguishing factual difference. Conceivably, the choice of either of two applicants or two communities might be within the realm of reason upon the facts. This is true whether the problem be approached from the standpoint of positive characteristics or from the standpoint of comparative need. Two communities may have the same need, or neither may need more service. The courts cannot hold that a new station license must be denied merely because there is no compelling factual difference between the applicants. In such a case, the Commission would indeed have wide discretion. The important task of the courts in that event would be to insure that the factual situation had been fully explored. In that respect, as we point-

ed out in the Johnston Broadcasting case, supra, the Commission and the court must necessarily rely upon the industry and ability of the competitors for the license.

In the case before us, the Commission stated the basis upon which it acted. It said:

"Upon consideration of the size of the two cities, the existing facilities of each and the amount of radio service available to each, we conclude that Allentown is in greater need of another radio station than Easton; that its need for another radio station is greater than Easton's need for extended services from its existing station, WEST; and that the purposes of Section 307(b) of the Communications Act would be better served by a grant to one of the Allentown applicants than by a grant to either of the Easton applicants."

It made detailed findings of the power, frequency, type and time of the existing and authorized stations and service. It found that each community had one full-time station, that the larger community also had two daytime-only stations, and that the smaller community had daytime primary service from a station outside the area. It described, by findings, each of the applicants and the proposed programs of each. So much is clear.

What facts did the Commission fail to find? As we have pointed out, we cannot assume that there are facts not found. We must look to appellant's contentions to ascertain whether there were any omissions. Appellant is explicit. First, it says that the statute requires the Commission to consider the power and hours of operation of existing stations and that it has not done so; that the comparative results obtained by evaluating the power and hours of operation of the various stations by a point system (i. e., by assigning point values to each feature of each station and thus arriving at comparative composite totals) compels a conclusion contrary to that reached by the Commission. Second, it says that the Commission must find the type of service available to the two communities from the stand-

[5] 1938, 68 App.D.C. 282, 96 F.2d 554, certiorari denied, 1938, 305 U.S. 613, 59 S.Ct. 72, 83 L.Ed. 391.

[6] 1938, 68 App.D.C. 292, 96 F.2d 564.

point of present and proposed programs, so as to justify its conclusion that one community has greater need than the other for a new station. Third, it says that the Commission was required to value FM service the same as it valued AM service in making its conclusion. We must consider whether the Commission was required to make the findings thus suggested by appellant.

The Commission made basic findings as to the power, time of operation, etc., of each station, and recited that it gave consideration to these existing facilities and the amount of radio service available to each community. It did not point out how much, or in what fashion, it gave weight to these factors of power and hours of operation. The Commission denies that it should or could do so.

There is no mutually acceptable system of evaluation for these features of radio service, so far as we are advised, and no method is submitted to us with the assertion or suggestion that, if adopted, it would produce accurate, conclusive results. To devise such a method or formula would seem to us to be a task, if not impossible, at least of infinite complexity. By way of simple example, we refer to two features of this case. Appellant would assign no value to the primary service which Easton receives in the daytime from the New York station. The Commission says that if there be an evaluation of community radio service, service from outside the area should be assigned full value according to its power. The whole of a comparative mathematical evaluation of the service presently available to the two communities might well depend upon how much or how little value would be assigned the service from the outside station. It would seem clear that if there were no service in this area except that coming in from the outside to Easton, so that Easton had that service and Allentown had none, Allentown should get the new station. Likewise, it would seem clear that if Allentown had a local station, usable for local expression and local news, and

Easton had none, Easton should get the new station. Those would be conclusions of reasonableness, quite apart from scientific demonstration. But by what combination of variables one would assign a mathematical value to a service from a source outside the community, we could not say. And since no system or formula is advanced with the claim that it would produce sound results, we cannot require the Commission to devise one.

Again, appellant would assign each station one factor in direct proportion to its power. That could not be accurate evaluation, in our view. For, to the people in the immediate community, one power is of like value as another, so long as it renders primary service. Here again we could not say by what combination of variables the service indicated by station power may be measured. And, again, no standard of measurement avowed to be accurate is presented to us.

■ Earlier statutes provided for a determination by formula.[7] But experience with that effort demonstrated its unfeasibility, and the law was, therefore, changed to its present form upon the plea of the Commission. That change must be heeded. We conclude upon this point that the Commission was not required to make a mathematical evaluation of existing service.

■ Appellant's next contention is that the Commission should have made findings as to the service presently available to each community in terms of radio programs. The Commission concluded, as its statement shows, that "Allentown is in greater need of another radio station than Easton". Moreover, says appellant, the Commission should also have found which applicant would more effectively supply that need, if greater need be found in Allentown. We agree with appellant on this point. We cannot tell from the findings what caused the Commission to say that Allentown's need was greater. Present and proposed programs would seem to be an essential element in testing comparative community

7 Sec. 307(b) of the Communications Act of 1934, supra note 3, which was originally an amendment of March 28, 1928, 45 Stat. 373, to the Radio Act of 1927, 44 Stat. 1162.

needs from the standpoints of both the receivers and the broadcasters. Appellant urges the point as a factor of weight which was proved in this case. The record contained evidence upon the programs. The Commission made findings as to the composition and character of the program proposals of the two applicants. But it gave no indication of their comparative qualities, or of the lack of any particular type of service in either community, or of the greater ability of either applicant to meet that need.

■ It may be that the Commission measured the comparative need by the comparative size of the communities. But difference in size does not necessarily spell a difference in need. It is not the court's function to fashion from the evidence the established facts, and from the facts the conclusion. The court looks at the conclusion found by the Commission merely to see that it falls within the perimeter of reason drawn by the findings; and at the findings to see that they have support of substance in the evidence. In the case before us, we cannot tell why the Commission concluded that Allentown had greater need for a new station than did Easton; or, if Allentown's need was greater, why it concluded that the intervenor would supply that need to a greater extent than would the appellant. Therefore, we cannot tell whether the conclusion of greater need by Allentown and the award to intervenor were or were not arbitrary. The case must therefore be remanded for findings upon this phase.

Appellant's next point is that the Commission was required by Section 307(b) of the statute, above quoted, to take into account existing FM, as well as standard (AM), stations in determining the location of a new standard station.

The precise scientific difference between FM stations and standard, or AM, stations need not be explored for purposes of this case.[8] The two methods of transmission are physically radically different. They require different transmitters and different receivers. Because of the great difference in the channels designated for use by each, they do not interfere electrically with each other. FM operation is a relatively new development.

■ It is true that in making the equitable distribution of radio service which the statute requires, the Commission must take cognizance of every feature of existing service in the broadest sense. But we do not have that question. The Commission considered the data as to existing FM stations proffered by appellant, and concluded that the weight which should be given them would not cause a difference in result. The contention in the present case is that, in making a comparison of communities to determine the location of a new AM station, FM stations must be assigned factors of value of the same sort and in the same manner as AM stations. In other words, as we understand the contention, it is that in a comparison for that purpose, a station should count as a station, whether AM or FM.

Standard, or AM, broadcasting has developed gradually over the country over the years.[9] By Commission regulation, carrier frequencies have been assigned in successive steps of 10 kilocycles in the radio spectrum band between 550 and 1600 kilocycles. Three types of channels have been set up: clear, with stations of power between 10 and 50 kilowatts; regional, with stations of power not in excess of 5 kilowatts; and local, with stations of 250 watts power. The available frequencies have

---

[8] In order to achieve the variation in electric waves necessary to reproduce sound tones, AM (amplitude modulation) transmitters vary the maximum value (intensity) of the waves; FM (frequency modulation) transmitters vary the frequency. FM transmission is practical in a very high frequency band and is relatively free of sky wave. Under the present designation, by the Commission, of channels to be used, FM is less subject to interference than is AM. Higher quality of sound reproduction is achieved by FM, since the width of the channel remains unchanged in this method of modulation and the carrier wave can thus be modulated to all audible frequencies.

[9] The facts recited in the following part of this opinion may be found in the Commission's Rules and Standards of Good Engineering Practice and in the standard authorities on radio broadcasting; e. g., Pike & Fischer Radio Regulation; Warner Radio & Television Law.

been assigned to the several classes of channels. Upon these bases, the nationwide system of standard broadcast stations has grown. Viewed as a whole, these stations constitute a pattern of broadcasting, complete but not overlapping.

The Commission approached the problem of FM broadcasting, first proposed in 1935, with a considerable degree of caution. However, it has now formulated a plan for its development. It has assigned for FM use one hundred channels of frequencies between 88.1 megacycles (88,100,000 cycles) to 107.9 megacycles, a wholly different band in the radio spectrum from that used by AM broadcasters. The separation of assigned channels for FM use is 200 kilocycles. The Commission has prepared and published an allocation plan,[10] in which it has made a tentative distribution of these channels to the various cities and communities throughout the United States. The interrelationship of these channels as thus allocated makes a pattern of broadcasting over the country. This proposed distribution of FM channels, and thus of prospective FM stations, has no physical relationship with the AM broadcasting channels or stations. The two are physically independent of each other. Both can exist in the same area at the same time.

Persons with AM receivers cannot get FM signals, and vice versa. So that new FM stations afford no new service to people with AM receivers; and vice versa. Manufacturers are beginning to make receiving sets with both sorts of receivers, but the eventual outcome of the competition between the two types of broadcasting is currently one of the mysteries.

█ The question before us in the case at bar is whether, in locating a new AM station, the Commission is required to assign to FM transmitting stations, existing or proposed, in the respective communities, the same values and thus the same consideration as to AM stations.

The Commission says that since the statute itself makes no differentiation between the treatment of AM and FM applications, if the statutory language means that FM stations must be considered in fixing the lo-

cation of new AM stations, it also means that existing AM stations must be considered in fixing the location of new FM stations. This converse of appellant's contention poses a serious question in the development of radio communication. If this converse be true, the development of the newer system in areas which have shown progress in establishing the old, would be greatly impeded. The total result would be that instead of achieving over the country an even development of the new, a most irregular development would occur, areas not theretofore served being by compulsion the almost exclusive possessors of the new system. Viewed thus, the question is whether Congress meant that in planning the nationwide development of a new phase of the constantly progressing radio service, the Commission is bound to the pattern already established by the development of AM broadcasting; in other words, whether, in licensing new FM stations, it is required to fill in the interstices in existing service before it can grant the new type of service to those who already have the old. We do not think so.

█ The Commission says that the new service calls for a new pattern of allocation, or at least a fresh one. Whether it does is not for us to say. Our function is simply to determine whether Congress has directed the contrary. We find no such direction in this statute. We think that "fair, efficient and equitable distribution of radio service" permits a new pattern for a new service which cannot, because of its physical nature, be superimposed upon the old.

Certainly the statute does not require that the Commission give prohibitive weight to the existence of radio stations in allocating television stations. To a less dramatic but equally persuasive extent, the same is true of the location of FM stations.

So much being clear as to the consideration of existing AM stations in the location of new FM stations, we return to appellant's actual contention, that FM stations must be considered in the location of new AM stations. We think that what is true of the converse is true of the proposition in this instance.

---

[10] 12 Fed.Reg. 4031 (1947).

We do not think that an extension of the older service need necessarily contemplate the pattern of development of the new. Again we point out that the difference between AM and FM is not a mere classification by the Commission. It is a fundamental physical difference. Different principles may govern the proper location of the stations. This statute does not, it seems to us, forbid the older service to be extended where the new has been installed, and does not require that the existence of the newer type of service be a controlling factor in the extension of the old. FM service is, of course, a radio service, and so, in a comparative evaluation of two communities for radio purposes, if it exists in one or the other, its presence must be noted. And in some cases the general over-all situation might, in the last analysis, after all the facts are viewed, be the controlling feature in the determination. But the Commission is not required to ignore the basic difference between the two services. If the comparison is for the purpose of locating an AM station, and if one community has an FM station, the Commission is not required to consider that community as though it had an AM station. If one community has two FM stations and the other an AM and an FM, the Commission is not required to limit its consideration to an undefined conclusion that both communities have two stations. In this latter instance, it could properly find that while both towns have FM service, one has AM and the other has not; and the facts as to the AM service might well control the placement of a new AM station. So, in the case at bar, after the Commission had viewed the existing FM service to ascertain whether there was any determinative factor in that feature of the situation, and had found that there was none, it could properly proceed with its conclusion as to new AM service upon a consideration of the existing AM service. The position of appellant upon this point, ably and vigorously pressed upon us by its counsel, is, in substance, that the Commission must view existing AM and FM stations as though they were alike, and so must give them the same weight, in any comparison of communities for a new station of either type. We do not think that view of the statutory requirement correct.

Furthermore, it appears that in the Commission's revised tentative allocation plan for Class B FM stations, the four channels assigned to the area involved in the case at bar are assigned to Allentown-Bethlehem-Easton as one area, and not separately to the respective cities.[11] They are owned by the existing AM station owners, including the Easton AM station. All the existing FM stations provide service to the whole area. What the location of the transmitters and studios of these stations ought to be, is not in this case. That is a question of the proper location of FM facilities. But it seems clear that service allocated to and being received by an entire area cannot be wholly assigned to one spot or another for the purpose of evaluating the services available to each separate community in the area.

The case must be remanded for findings upon the comparative needs of the two communities for new radio service and the relative abilities of the applicants to serve the greater need. Upon the other points at issue, the conclusions of the Commission are affirmed.

Remanded for further proceedings.