**DELTA AIRLINES, INC., Petitioner,**

v.

**CIVIL AERONAUTICS BOARD,**
**Respondent,**
**Southern Airways, Intervenor.**

**No. 23557.**

United States Court of Appeals,
District of Columbia Circuit.

Argued June 26, 1970.

Decided Dec. 4, 1970.

Mr. Robert Reed Gray, Washington, D. C., with whom Messrs. R. S. Maurer, James W. Callison, Atlanta, Ga., Louis Hayner Kurrelmeyer, New York City, and Benjamin R. Achenbach, Jr., Washington, D. C., were on the brief, for petitioner.

Mr. Robert L. Toomey, Atty., Civil Aeronautics Board, for respondent. Messrs. Joseph B. Goldman, General Counsel, Civil Aeronautics Board at the time the brief was filed, O. D. Ozment, Deputy General Counsel, Warren L. Sharfman, Associate General Counsel, Litigation and Research, J. Michael Roach, Atty., Civil Aeronautics Board, and Howard E. Shapiro, Atty., Department of Justice, were on the brief, for respondent. Mr. R. Tenney Johnson, General Counsel, Civil Aeronautics Board, also entered an appearance for respondent.

Mr. Cecil A. Beasley, Jr., Washington, D. C., with whom Messrs. John Law Elliott and John C. Smuck, Washington, D. C., were on the brief, for intervenor.

Mr. Joseph D. Sullivan, Washington, D. C., filed a brief on behalf of the City of Memphis, Tennessee, and the Memphis Area Chamber of Commerce, as amici curiae.

Before ROBB and WILKEY, Circuit Judges, and DAVIS*, Judge, United States Court of Claims.

WILKEY, Circuit Judge:

Petitioner, Delta Airlines, Inc., seeks judicial review of the Civil Aeronautics Board Final Order and Order on Reconsideration in its *Southern Airways, Inc., Route Realignment Investigation,*[1] which

---

* Sitting by designation pursuant to Title 28, U.S.Code, Section 293(a).

1. Docket No. 18,610.

awarded new airline routes to Southern Airways, Inc., Intervenor, and denied such new authority to Delta.

The Board's two orders [2] extended Southern's routes in Tennessee, Alabama, and northern Florida to Orlando and Miami, thus creating a new Memphis/Birmingham-Miami service, and removed Southern's existing one-stop restriction on its route between Atlanta and Nashville; simultaneously the Board denied competing comparative applications by Delta for non-stop Memphis/Birmingham-Miami authority and for a new route between Atlanta and Nashville. Delta seeks no decision from this court granting the routes it applied for, but it does urge that the Board did not properly deal with Delta's application below. For reasons stated herein, we remand the case to the Board for reconsideration in accordance with the views hereafter expressed.

## I. Route Realignment and Comparative Determination

In June 1967 the CAB instituted the proceeding below to determine, first, whether the existing 15 segments of Southern's certificated routes should be realigned into six segments and, second, whether Southern's routes should be extended southward from Alabama and Tennessee into southern Florida. The CAB thus deliberately initiated a hybrid *Investigation*, part local service realignment and part new route authorization. This it was entitled to do. But the two phases of this *Investigation* are significantly different.

The first phase proposed realigning the routes of Southern, a local service carrier, to improve its operational flexibility and allow it to provide improved and more economical service between points in Alabama, Tennessee, Georgia, and northern Florida for which it was already certificated. These routes generally involved the servicing of traffic between numerous small cities in this area and the larger trading centers of Memphis, Birmingham, and Atlanta. However, in one segment of the realignment, Southern would have obtained authority to fly non-stop between Nashville and Atlanta, two large trading centers, in competition with trunkline carriers.

At no time in the proceedings was the realignment of the routes between the small cities serviced by Southern and the larger centers challenged. However, Delta's application for new authority between Atlanta and Nashville was consolidated in the realignment hearing for Southern in accordance with the *Ashbacker* [3] doctrine changing that facet of the realignment investigation to a comparative hearing.

The second phase of the *Investigation* involved new route authority for Southern from points on its existing routes to Miami via Orlando and Tallahassee, and other carriers, including Delta, had filed competing applications for this authority, which included the right to fly non-stop service between Memphis/Birmingham and Miami. Accordingly, from the outset this phase of the *Investigation* had all the characteristics of a comparative hearing.

After the Examiner's Initial Decision in September 1968, the Board in February 1969 issued an order which effected a complete separation of the competing applications from the unopposed realignment of Southern's routes to northern Florida. The Board approved all the route improvements, consolidations and realignments recommended by the Examiner for Southern, and added others. As to the competing comparative applications, the Board by the same order stayed the Examiner's Initial Decision and set these questions for full review by the Board. Thus, after this order the original hybrid *Investigation* was

---

2. Final Order and Opinion 69–9–132, 24 September 1969, and Order on Reconsideration and Supplemental Opinion 69–11–94, 21 November 1969.

3. Ashbacker Radio Corp. v. FCC, 326 U.S. 327, 66 S.Ct. 148, 90 L.Ed. 108 (1945).

entirely a comparative application case involving Southern, Delta, and three other major carriers,[4] for non-stop authority on long-haul routes, between the largest market centers in the southeastern United States.[5]

It is quite apparent that the inspiration for the original investigation was the desire of the Board to benefit Southern Airways, at least to the extent of getting it off subsidy, a laudable public service if this could be accomplished. A twin objective of equal importance was to provide additional and better service for the smaller cities in northern Florida, Tennessee, and Alabama.[6] The Board, to a varied degree, achieved both these aims by its order in February 1969 realigning Southern's existing route system to northern Florida.

But when it came to the granting of authority involving the lucrative non-stop routes servicing Memphis/Birmingham-Miami and Atlanta-Nashville, the praiseworthy aims of getting Southern off subsidy and providing better service to the smaller cities had to be evaluated as to chances of success in accordance with due process standards, and had to be balanced against other competing public and private interests, namely, the public interest of the needs of prospective passengers in the larger cities and the comparative capacities of the competing airline applicants to service these routes.[7] The failure of the Board was in not making these evaluations by accepted due process standards; and this failure, we think, did deprive Delta of the fair adversary determination to which it was entitled.[8]

## II. Decisional Criteria

Before the CAB can issue a certificate of authority for a carrier, the Federal

4. Eastern, National, and Northwest. *See* Opinion and Order 69–2–86, 18 February 1969, Order No. 4.

5. Memphis, Nashville, Birmingham, Atlanta, Jacksonville, and Miami.

6. "[E]xtending Southern into these Florida cities should improve service convenience to the public, and, at the same time, on the basis of our preliminary analysis, it appears that such operations would be profitable to the carrier. Since our objective is to strengthen the carrier and afford it an opportunity to reduce its subsidy requirements, we have confined our analysis to the relatively longer-haul markets and higher density points." CAB Order No. E–25230, 1 June 1967, at 4.

7. Federal Aviation Act, 49 U.S.C. § 1301 *et seq.* Before the Board can issue a certificate authorizing an air carrier to engage in air transportation in the United States, it must find that such transportation "is required by the public convenience and necessity." *See* Federal Aviation Act § 401(d) (1), 49 U.S.C. § 1371(d) (1).

8. The Administrative Procedure Act § 7 (c), 5 U.S.C. § 556(d) provides:

[A] party is entitled to present his case * * * by oral or documentary evidence, to submit rebuttal evidence, and to conduct such cross-examination

as may be required for a full and true disclosure of the facts.

Section 8(b) of the same Act, 5 U.S.C. § 557(c), requires all agency decisions in matters in which a hearing is required to:

[i]nclude a statement of * * * findings and conclusions, and the reasons or basis therefor, on all the material issues of fact, law, or discretion presented on the record * * *.

"When two or more applicants for certification seek mutually exclusive grants of authority, they may both be qualified and the inquiry then must be which would better serve the public interest. The Board must consider and make a relative determination and evaluation of all pertinent factors." Braniff Airways, Inc. v. CAB, 126 U.S.App.D.C. 399, 402, 379 F.2d 453, 462 (1967). "The requirement for a comparative proceeding means all the give-and-take of contesting parties, including cross examination, rebuttal, participation in prehearing proceedings, objections, briefs and arguments as contesting parties." Delta Airlines, Inc. v. CAB, 97 U.S.App.D.C. 46, 51, 228 F. 2d 17, 22 (1955). *See also* Easton Publishing Co. v. FCC, 85 U.S.App.D.C. 33, 175 F.2d 344 (1949) ; Johnston Broadcasting Co. v. FCC, 85 U.S.App.D.C. 40, 175 F.2d 351 (1949) ; and Suspended Passenger-Fare Increase Case, 25 C.A.B. 511, 541 (1957).

Aviation Act of 1958 requires the Board to find in formal language that such air transportation "is required by the public convenience and necessity." [9] Therefore, where there are new routes involved, the first inquiry is logically whether the markets to be served actually need new or additional air service. This is not a perfunctory pro forma inquiry; the finding of a public need for the air service, with specific details as to the quantity, quality, frequency, type, equipment required, facilities available, etc., is a fundamental starting point.[10] The next question, dependent upon the findings as to the first primary question, is which carrier or carriers can provide the needed air transportation service, assuming any is needed at all. The Board has followed this logical approach in many cases, including several decided in 1969.[11] Even where multiple routes are involved, an individual determination of need has been made for each market before the question of which carrier should be selected is determined.[12]

These basic criteria, and their logical sequence, are no mere theoretician's symmetrical delight. They are guides to sound decisions by the Board, and can be ignored only at the risk of unsound decisions, a risk which may have materialized here. An unsound decision on route allocation, awarding a route to a carrier when neither the need justifies it nor does the carrier have the ability to service it, hurts all concerned: the public interest by saddling the country with an inefficient and distorted air transport system, and perhaps an augmented subsidy; the carrier which could most efficiently service the route but which is barred from doing so; the "successful" carrier which may have a liability on its hands rather than what it optimistically envisioned as a financial asset. Entrepreneurs are congenitally optimistic, and properly so; the duty of the Board is to make a coldly objective appraisal; it has statutory and decisional guidelines to assist it in doing so. We are not called upon to decide directly if the Board made a sound decision; judicial review calls on us to determine only if the Board followed established principles and procedures which provide the required procedural due process for the adversary parties and which should lead to a sound decision.[13]

III. *Metamorphosis of the Board's Financial Data*

A. *Readjustments or Reestimates of Southern's Earning Capacity*

The original idea of the Board was that an extension of Southern's system to Orlando and Miami would be profitable and would therefore reduce Southern's subsidy requirements, an estimable objective. However, these predictions of profitability were not borne out in the hearing before the Examiner. He found that the Atlanta-Miami route would *increase* Southern's subsidy need by $425,000 and logically he denied this route to Southern.[14] He also found that the Birmingham-Miami route would create an operating loss of $29,000 and require even more subsidy, hence he conditioned his award of this on Southern also obtaining the Miami-Key West

---

9. Note 7, *supra.*

10. In the Bureau Counsel's Request for Evidence issued after the prehearing conference on 19 October 1967 detailed information was requested regarding carrier schedules and fares, air traffic, carrier financial forecasts, carrier operating statistics, present and proposed equipment, airport facilities, and economic characteristics and population trends of the cities involved. These criteria reflect the true nature of the initial inquiry in a comparative hearing.

11. Dallas/Fort Worth-Phoenix Nonstop Service Case, Order 69–7–137 (1969); Gulf States-Midwest Points Service Investigation, Order 69–5–25 (1969); and Southern Tier Competitive Nonstop Investigation, Order 69–7–135 (1969).

12. *See* Gulf States-Midwest Points Service Investigation and Southern Tier Competitive Nonstop Investigation, *supra* n. 11.

13. *See* Braniff Airways, Inc. v. CAB, 126 U.S.App.D.C. 399, 379 F.2d 453 (1967).

14. Examiner's Initial Decision, at 50.

route.[15] The Examiner found that the unrestricted Nashville-Chattanooga-Atlanta route would increase Southern's operating profit by $200,000.[16]

In argument before the Board, various parties challenged the figures as erroneous. Southern in its brief to the Board recomputed its traffic forecast on the basis of estimates for the year *1970*, figures for a period which had not been used by the Examiner and which were available for use comparatively by no other party. One airline, Southeast, moved to strike the 1970 estimated data or alternatively to remand the case for reopening of the record, a position supported by Delta.[17] Delta argued that at least four adjustments must be made to the Examiner's 1969 review forecast for Southern, any of which would have eliminated operating profit.[18] The Board never ruled on Southeast's motion, nor did it specifically meet Delta's and the other parties' challenge to the accuracy of the Examiner's prophecy of Southern profits.

The Board started afresh, and first it cast aside one reed of support the Examiner did have. The Examiner had stated:

The prior conclusion that Southern *could operate at a modest profit* between Birmingham and Key West is predicated on the assumption that it

would be the *sole certificated carrier* operating in the Miami-Key West market.[19]

The Board gave Southeast the Miami-Key West operating authority,[20] and then rejected the Examiner's conclusion that Southern would incur a loss:

We do not accept this conclusion, nor the financial forecasts upon which it was based. Instead, we have reviewed the markets concerned and find that Southern can achieve an operating profit of over $700,000 and a subsidy need reduction of approximately $50,000 in 1970. As indicated in detail in Appendix A, *we have used 1970 as the forecast year, increased revenues by 15 per cent for on-line connecting traffic,* and employed various standard techniques to determine stimulation and participation.[21]

The source and reliability of the calculations used by the Board were nowhere demonstrated.

B. *The 1970 Data*

The questionable accuracy of the 1970 data figures in Appendix A to the Board's September 1969 order was not long in being revealed. Two months later came the Board's Order on Reconsideration, wherein the Board admitted that Appendix A contained errors of about one-half million dollars.[22] The

---

15. Examiner's Initial Decision, at 59–60.

16. The Examiner made no finding as to the profitability of the non-stop Nashville-Atlanta flights, which Delta and Eastern opposed as diversionary. The Examiner discussed the financial advantages of one-stop Nashville-Atlanta service, but wound up concluding that Southern's authority should be unrestricted. Examiner's Initial Decision, at 19–22.

17. The record shows that at oral argument before the Board, Delta agreed with and supported the Southeast motion.

18. These adjustments were to compensate for: (1) improper use of the "understatement theory" by the Examiner; (2) use of an incorrect dilution factor by the Examiner; (3) acceptance by the Examiner of abnormally high participation estimates advanced by Southern; and

(4) failure of the Examiner to correct for "double counting" of passengers by Southern in the Miami-Key West market.

19. Examiner's Initial Decision, at 60. The Examiner had said at page 59 of his decision:

As previously concluded herein, without any consideration of revenues from Key West passengers Southern would experience a loss of $29,000 annually from operating the Birmingham-Miami service.

20. Final Order and Opinion 69–9–132, at 2.

21. Final Order and Opinion 69–9–132, at 4. (Emphasis added.)

22. The Board said:

Eastern has proposed a large number of downward adjustments to our forecast, whose net effect would be to decrease

Board then proceeded to make a *new* 1970 forecast, employing forecasting techniques that had not been employed by either the parties or the Examiner. The calculations made by the Board on the basis of 1970 estimates in Appendix A were never subjected to examination or cross-examination in any administrative proceeding. They were challenged by several parties—successfully, as shown above—after the Board's order in September 1969. The validity of all awards of new routes to Southern and the denial of any routes to Delta rests upon the Board's 1970 forecast figures supplied in its Order on Reconsideration, which is challenged for the first time in this judicial review.

The Board urged strenuously at oral argument that the Board and its processes were not subject to cross-examination by the interested parties. With this we can agree, but the financial data and the method of calculation or financial forecasting employed by the Board should be subject to examination and cross-examination by the adversary parties. It is for this reason that, if the Board is to rely on its wholly new 1970 forecast, it is required to hold a hearing as contemplated by the Administrative Procedure Act:

> A party is entitled to present his case * * * by oral or documentary evidence, to submit rebuttal evidence, and to conduct such cross-examination as may be required for full and true disclosure of the facts.[23]

The questionable reliability of this 1970 forecast is indicated by the admitted fact that it involves a *1970* forecast of operating *revenues* for Southern, while the 1970 cost figures compared by the Board were not an estimate of 1970 costs but were an extrapolation of previous *cost experience* of Southern and other airlines for the year ended March *1969*.

Appendix A (Revised) to the Board's Order on Reconsideration of November 1969 used average Local Service Air Carriers' Unit costs for indirect costs and Southern's costs for direct costs. For the year ended March 1969 these costs were stated as *lower* than the costs for the similar period ended March 1968, relied on by the Board in its Appendix A to its original Final Order of September 1969. Hence, although the Board's 1970 forecast of *Southern's revenue* (having been challenged by the other parties) was actually *lower* in Appendix A (Revised) than it had been two months earlier, yet the Board could still predict an operating profit of about $650,000 and a consequent $20,000 subsidy reduction for Southern *because of lower costs*.[24] We are extremely dubious that airline cost figures can be simply extended from the past to provide a worthwhile forecast for the future with no allowance made for an upswing in airline costs in 1970. Whether this doubt is proved right or wrong, the other parties to this comparative proceeding to determine the award of new airline routes are entitled to an open adversary hearing to disprove their accuracy.

We have alluded above to the lack of opportunity for the other parties to

Southern's revenues and increase its costs by $739,000. Some of these proposed adjustments we have accepted or rejected *in toto*, while still others we have accepted in part. * * * It suffices to say that the downward adjustments we have accepted reduce projected operating profit *by some $530,-000*, and its indicated subsidy need reduction correspondingly.

Supplemental Opinion and Order on Reconsideration 69-11-94, at 7-8. (Emphasis added.)

23. 5 U.S.C. § 556(d).

24. To arrive at this operating profit in light of the $530,000 decrease in the operating profit of about $720,000 forecasted for Southern in Order 69-9-132, the Board increased its estimate of Southern's revenues in the Miami-Tallahassee market by $287,000, based Southern's projected 1970 revenues upon increased fare rates which became effective more than a month after the case was argued to the Board, and subtracted a cost figure based upon Southern's past costs for the period 1 April 1968-31 March 1969.

challenge the 1970 figures in relation to Southern. But another flaw in the Board's procedure in using these 1970 forecasts is that no other party put in, or indeed had an opportunity to utilize, 1970 forecast figures for its own operations on these routes. We were told at oral argument that updating of figures is frequently indulged in by the Board or the Examiner after the evidence is closed, otherwise the final decision may come out based on stale statistics. But surely such updating can only be justified if done on a *comparative* basis, *i. e.*, updating the forecasts for all parties.[25] It can hardly be termed a "comparative proceeding" if the financial forecast for one applicant, Southern, is based on 1970 data, while the forecasts for all the other competing applicants for the same routes are pegged to 1969 estimates.[26] As we said in a previous CAB case: "The requirement for a comparative proceeding means all the give-and-take of contesting parties, including cross examination, rebuttal, participation in rehearing proceedings, objections, briefs and arguments as contesting parties." [27]

What was done here was not sufficient to meet that standard of an adversary proceeding; the Board's initial computations were too cryptic, had large errors and undisclosed premises, thus precluding adequate challenge. The later figures are, again, cryptic and contain untested premises.

The Board complains that it would defer proceedings interminably if there had to be a new hearing every time a new forecast year is used. There are

acceptable alternative solutions, three of which are: *One,* the Board can work out, in advance, with all the airlines, general formulas for updating which can be applied mechanically in all (or almost all) cases, instead of depending on *ad hoc* computations in particular cases which ·are subject to attack and criticism; or, *Two,* the further hearing on updating can be limited to that issue alone and can be given special priority so that it need not delay proceedings unduly; or, *Three,* perhaps the Board can work out some procedure for an exchange of written views in advance of decision (*e. g.,* a tentative recomputation offered *for criticism to the* parties), which will give all parties an adequate understanding of the underpinnings and the details of the computations as well as an opportunity to point out errors and alternatives and to answer opposing presentations (akin to exchanges of proposed detailed findings of facts and objections to the others' findings).

The time lag created by this appeal may make all three solutions inapplicable to this case, on remand the Board may choose other procedures; nor do we imply that in other future cases the three suggested solutions are the only acceptable.

## C. Southern's On-line Connecting Traffic Revenues—1.5 percent to 15 percent

In its estimates presented to the Board, Southern used a figure of 1.5 percent for its on-line connecting traffic forecast.[28] This may have been modest,

25. Even if the parties had had opportunity to update their own forecast data to the year 1970, we are not saying that required administrative procedure would have been satisfied without an opportunity for the adverse parties to subject the various calculations to cross-examination and analysis.

26. The Board must surely agree with this, for in its brief herein it states: "The purpose served by the selection of a forecast year is simply to provide a uniform standard of comparison by means of which the results projected by one carrier can

be *measured in a meaningful way against* those projected by another carrier. Respondent's Brief at 37 (emphasis added).

27. Delta Airlines, Inc. v. CAB, 97 U.S. App.D.C. 46, 51, 228 F.2d 17, 22 (1955).

28. At the hearing before the Examiner, Southern credited itself with an additional factor of 1.5% of its specifically forecast traffic, for unmeasured "on-line connecting traffic." Southern said that this 1.5% factor was based upon experience, and this 1.5% factor was accepted and used by the CAB's Bureau of Operating Rights in its own exhibits.

but since it definitely was to Southern's advantage to show as high a figure as was reasonable for this on-line connecting traffic forecast, we assume that it was not excessively modest. But as quoted above, the Board's first opinion stated: "[w]e have used 1970 as the forecast year, increased revenues by *15 per cent* for on-line connecting traffic. \* \* \* " [29] The Board gave no explanation or justification for multiplying tenfold the on-line traffic possibilities as estimated by Southern itself, only saying that it had been used without objection in a number of recent cases, and conceding that its use was a novel technique. Of course this figure was never subject to cross-examination or exploration as to its foundation by any party.

This 15 percent increase was not unimportant. According to the Board's Appendix A to its order of September 1969, it accounted for $666,000 of the passenger revenue.[30] Added to other revenue increase of 10.52 percent, this multiplication miracle produced $736,000, more than Southern's entire $717,467 operating profit, and without it Southern's subsidy need would have increased proportionally.[31]

When Delta pointed out what a miracle the Board had wrought, in its Opinion on Reconsideration the Board took refuge in "recognition of these factors is admittedly a matter of expert judgment," and unashamedly asserted that "Delta has made no showing that our estimate here is unreasonable." [32] Of course no party had had an opportunity to show that the estimate of 15 percent

was unreasonable, as the record was closed. Southern had relied on an estimate of 1.5 percent, the motion of Southeast to strike these new figures or to remand the case for reopening of the record was never passed on by the Board, and there is nothing in the record up to now to justify it. When challenged, this can hardly be sustained as in accord with due process.[33]

This case is illustrative of the errors into which an administrative agency may fall when it does not keep distinct and separate its tripartite functions and powers—executive, legislative, and judicial. When the Board began this *Investigation*, it was exercising what was primarily an executive or administrative function in realigning the segments of the existing routes of Southern Airways. To this there was no opposition by other interested parties, and the job the Board was called upon to do was apparently performed in a workmanlike manner.[34] However, when the Board shifted to the consideration of awards on comparative applications for new routes, this, under its own statute, the Administrative Procedure Act, and relevant case law, called for adversary proceedings to take into account the perhaps conflicting public interests of the different communities involved and the certainly conflicting interests of the competing airlines seeking these new routes. In deciding this phase of the case the Board was clearly exercising a judicial function.[35]

In summary, the use by the Board of untested and unsupported 1970 revenue forecasts for Southern, unmatched by

---

29. Final Order 69–9–132, at 4.

30. Final Order 69–9–132, Appendix A, at 3.

31. Instead of $717,467 profit, Southern would have shown an operating loss of $18,533 ($736,000 minus $717,467). The return on capital and tax requirement to maintain Southern in this market is shown by Appendix A to Order 69–9–132 to be $669,684. Thus, without the crucial 15 percent increase, Southern's subsidy requirement would have been $688,217 ($669,684 plus $18,533).

32. Order on Reconsideration 69–11–94, at 10.

33. Wirtz v. Baldor Electric Co., 119 U.S. App.D.C. 122, 337 F.2d 518 (Supp. Op. after Remand 1964).

34. *See*, for example, the considerations of the Board in Northeastern States Area Investigation, 30 C.A.B. 606, at 666 (1959).

35. Note the adjudicative requirements specified by this court for comparative hearings in Delta Airlines, Inc. v. CAB, *supra* n. 8.

comparative Southern cost figures, and unmatched by 1970 forecasts of any other carriers' revenue and cost figures, the astonishing escalation of the on-line traffic figure tenfold, none of which was subject to cross-examination or other challenge—these are illustrative of the Board's failure to accord due process to Delta and the other competing applicants in exercising its judicial function.

The Board's Final Order 69–9–132 of 24 September 1969 and its Order on Reconsideration 69–11–94 of 21 November 1969 are hereby set aside and the case remanded to the Board for further proceedings in light of this opinion.

Robb, Circuit Judge, concurred in affirmance of conviction and in the result.