498 F.2d 66
 162 U.S.App.D.C. 115
 SOUTHERN AIRWAYS, INC., Petitioner,
v.
CIVIL AERONAUTICS BOARD, Respondent, Delta Air Lines, Inc.,
et al., Intervenors.
DELTA AIR LINES, INC., Petitioner,
v.
CIVIL AERONAUTICS BOARD, Respondent, Southern Airways, Inc.,
Intervenor.
 Nos. 73-1375, 73-1389.
 United States Court of Appeals, District of Columbia Circuit.
 Argued March 8, 1974.
Decided May 24, 1974.
 
 John Law Elliott, Washington, D.C., with whom Cecil A. Beasley, Jr., and John C. Smuck, Washington, D.C., were on the brief, for petitioner in No. 73-1375 and intervenor Southern Airways, Inc. in No. 73-1389.
 Robert Reed Gray, Washington, D.C., with whom James W. Callison, Atlanta, Ga., and Louis Hayner Kurrelmeyer, Washington, D.C., were on the brief for petitioner in No. 73-1389 and intervenor Delta Air Lines, Inc. in No. 73-1375.
 Robert L. Toomey, Atty. C.A.B., with whom Richard Littell, Gen. Counsel, O. D. Ozment, Deputy Gen. Counsel, Joan Marie Frankel, Atty., C.A.B., and Howard E. Shapiro, Atty., Dept. of Justice, were on the brief for respondent. R. Tenney Johnson, Gen. Counsel, C.A.B., and Warren L. Sharfman, Associate Gen. Counsel, Litigation and Research, C.A.B., at the time the record was filed, also entered appearances for respondent.
 Theodore I. Seamon and Joseph D. Sullivan, Washington, D.C., were on the brief for intervenors, City of Memphis and Memphis Area Chamber of Commerce. Lawrence D. Wasko, Washington, D.C., also entered an appearance for Memphis intervenors.
 Aaron A. Wilson and Nordahl E. Holte, Kansas City, Mo., were on the brief for intervenor, City of Kansas City, Mo.
 Before HASTIE,* United States Senior Circuit Judge for the Third Circuit, and WRIGHT and WILKEY, Circuit Judges.
 WILKEY, Circuit Judge:
 
 
 1
 Petitioner Southern Airways, Inc. (Southern) challenges Civil Aeronautics Board Order No. 73-2-90, entered 23 February 1973.[1] The comparative hearings underlying the Order were conducted pursuant to this court's decision in Delta Airlines, Inc. v. CAB,[2] which vacated and remanded a 1969 Board order extending Southern's route authority between Memphis and Florida and denying Delta authority to operate nonstop between Memphis and Miami.[3] In its 1973 Order, the Board granted Southern an extension of its existing Memphis-Tallahassee route to Orlando and Miami and permissive authority to provide nonstop service between Memphis and Orlando/Miami.
 
 
 2
 Other aspects of the Board's Order prompted Southern's petition for review: (1) the grant to Delta of mandatory authority to provide nonstop service between Memphis and Orlando/Miami; (2) the restriction of Southern to two-stop service between St. Louis/Chicago and Orlando/Miami; and (3) the imposition of a $12,000 license fee on Southern. We find the Board's Order reasonable, supported by substantial evidence in the administrative record;[4] we affirm. Given our disposition, we need express no opinion on Delta's contingent petition for review.[5]
 
 I. GRANT OF NONSTOP AUTHORITY TO DELTA
 
 3
 In deciding to grant nonstop Memphis-Orlando/Miami authority to Delta, the Board first determined that there was need for nonstop service along that route.[6] The Board then selected Delta to provide the needed service on the following rationale:
 
 
 4
 Our choice of Delta . . . is grounded on two primary considerations. First, Delta has been the dominant carrier in the market for many years and, in 1971, participated in more than 70 percent of the traffic. By contrast, Southern's market share in that year was about 8 percent. Second, Delta's service proposal is markedly superior to Southern's. The trunk carrier would provide twice as many nonstop frequencies-- four daily round trips compared to two-- better-timed schedules, and a broader range of services.
 
 
 5
 In addition to its service advantage in the primary market, Delta would bring important beyond benefits to Kansas City-Miami passengers by adding four daily one-stop round trips to the market's service pattern . . ..[7]
 
 
 6
 Southern does not argue that the expressed criteria for decision are inappropriate. Nor could it so argue, since the criteria clearly relate to the general 'public convenience and necessity' standard for the Board's consideration of applications for authority, prescribed in section 401(d)(1) of the Federal Aviation Act.[8] Moreover, the Board's use of similar criteria was approved by this court in Continental Air Lines, Inc. v. CAB.[9]
 
 
 7
 What Southern does argue is that the Board may not, as it allegedly did in this case, 'employ without adequate explanation decisional criteria substantially different from prior criteria used by the Board in this proceeding.'[10] To illustrate the 'different' criteria employed by the Board in the earlier proceeding, Southern cites the following language from the Board's 1969 order on reconsideration:
 
 
 8
 Nor did we overlook the possibility of both extending Southern into Florida and at the same time improving Delta's authority in certain of the principal markets. This course of action would produce some public service benefits, particularly in the Memphis-Miami market, but it would do so only at the cost of diverting traffic which Southern could otherwise carry, lessening the degree to which the carrier will be strengthened, jeopardizing the small subsidy need reduction we anticipate it will earn at the outset, and impairing its future ability to schedule improved service from its exclusive points to the Florida hubs . . .. We concluded that Southern's advantages in a broader group of markets outweighed Delta's in a few, and that the overall benefits resulting from the selection of Southern alone require a departure in this instance from our general policy of giving preference to a carrier seeking improved authority in markets in which it has an existing stake.[11]
 
 
 9
 Southern's argument misses the mark. For, basically, it appears that the Board did apply the same criteria in both the earlier proceeding and the one in controversy here. In the present Order challenged, the Board analyzed the impact of granting Delta nonstop Memphis-Orlando/Miami authority on Southern's growth and financial stability and concluded: '. . . Southern's Memphis/Alabama-Florida flights will be highly profitable and achieve a return on investment well above the carrier's system experience, regardless of whether Delta is named the Memphis-Miami nonstop carrier; and, second, . . . a Memphis-Miami nonstop award would not substantially strengthen Southern, at least in the near future.'[12] The criteria reflected in this statement are essentially the same as those applied in the Board's earlier order.
 
 
 10
 The difference in the conclusions reached in each case may be accounted for in part by the fact that the data underlying the two orders were different. The 1969 order was based on cost, revenue, and traffic data through March 1969 and on projections for 1969 (in the case of Delta and the other carriers) and 1970 (in the case of Southern).[13] The 1973 Order rests on data through the second quarter of 1970 and projections for 1972. Furthermore, the Board recognized in its earlier order that it was departing from the 'general policy of giving preference to a carrier seeking improved authority in markets in which it has an existing stake,' and conceded that granting Delta nonstop Memphis-Miami authority 'would produce some public service benefits.' These are the considerations that weighed most heavily in the Board's 1973 decision to grant Delta such authority.
 
 
 11
 That the Board gave these considerations greater weight in the 1973 Order than in the 1969 proceeding reflects the fact that, when this court remanded the 1969 order to the Board, it expressly instructed the Board to reevaluate its balancing of public service benefits against the goal of improving Southern's financial stability:
 
 
 12
 When it came to the granting of authority involving the lucrative nonstop routes servicing Memphis/Birmingham-Miami and Atlanta-Nashville, the praiseworthy aims of getting Southern off subsidy and providing better service to the smaller cities had to be evaluated as to chances of success in accordance with due process standards, and had to be balanced against other competing public and private interests, namely, the public interest of the needs of prospective passengers in the larger cities and the comparative capacities of the competing airline applicants to service these routes.[14]
 
 
 13
 Our remand would have been futile if the court had not expected that the Board might strike a different balance, as it has done in its 1973 Order.
 
 
 14
 Aside from its allegation of different decisional criteria, the second ground for Southern's attack on the grant of nonstop Memphis-Miami authority to Delta is that the Board considered the 'beyond area' benefits granting such authority would confer on passengers along the Kansas City-Miami route, without evaluating the need for improved service on that route. The 'beyond area benefit' in this case arises from Delta's ability to 'tack' its new Memphis-Orlando/Miami service to its existing Kansas City-Memphis service and thus increase the number of single-plane, one-stop flights between Kansas City and Orlando/Miami. Applying such beyond area analysis, without going into the needs of the other area, as a factor in determining which of two carriers should be granted authority along a given route has been sanctioned by this court.[15] The unwieldiness of converting every proceeding in which beyond area benefits are involved into an inquiry into the service needs of an entire area was further recognized in a 1973 opinion of this court, Delta Air Lines, Inc. v. CAB.[16] Thus Southern's argument has already been rejected.
 
 
 15
 It is clear from the foregoing that the Board's grant of nonstop Memphis-Orlando/Miami authority to Delta was reasonable and supported by substantial evidence. On established administrative law principles we must affirm.
 
 II. THE TWO-STOP RESTRICTION
 
 16
 In the challenged Order, the Board removed an existing two-stop restriction on Southern flights between St. Louis/Chicago and Tallahassee and replaced it with a two-stop requirement along the St. Louis/ Chicago-Orlando/Miami route.[17] Had this change not been made, Southern would have been authorized to offer at best three-stop service between St. Louis/Chicago and Orlando/Miami. Nevertheless, Southern protests that the Board should have allowed Southern to tack its existing St. Louis/Chicago-Memphis service to its newly-granted Memphis-Orlando/Miami permissive nonstop authority, and thus to create a new St. Louis/Chicago-Orlando /Miami one-stop route. We think the Board's imposition of the two-stop restriction was reasonable and supported by substantial evidence.
 
 
 17
 The Board proffered the following justification for the two-stop limitation: 'This restriction was designed to assure that Southern will concentrate on providing local services between Memphis and its existing Alabama and Florida points, on the one hand, and Miami and Orlando, on the other . . ..'[18] This reasoning has two basic components: (1) if granted the tacking authority, Southern might be tempted to enter the St. Louis/Chicago-Orlando/Miami one-stop market; and (2) if it did so, Southern's ability to provide local service between Memphis and Orlando/Miami would be impaired.
 
 
 18
 Both of these propositions are supported by substantial record evidence. The administrative law judge made the undisputed finding that 740,170 passengers traveled through the air along the St. Louis/Chicago-Orlando/Miami route in 1969.[19] This heavy concentration of traffic would have the potential of luring Southern into the St. Louis/Chicago-Orlando/Miami one-stop market, were the restrictions imposed by the Board not in existence. The danger that Southern's entry into this market would create is also apparent in the Board record. The administrative law judge further found, without contradiction, that 'the Chicago/St. Louis-Orlando/Miami markets . . . are high-density long-haul markets which receive multiple nonstop and one-stop services from trunkline carriers.'[20] It follows that any attempt by Southern to exploit these markets would encounter substantial, well-entrenched competition and might therefore result in financial losses that could impair Southern's ability to provide adequate local service in the Memphis/Alabama-Florida market. Thus, notwithstanding the Board's general policy of not attaching certificate restrictions,[21] the Board was justified in concluding that the public interest would be served by preventing Southern from straying into the one-stop St. Louis/Chicago-Orlando/Miami market at the expense of its basic local service obligations.
 
 
 19
 Southern's secondary line of attack on the two-stop restriction is that the imposition of such a restriction on Southern cannot be reconciled with the failure similarly to limit Delta's St. Louis-Miami authority. We disagree. The Board concluded that 'neither Eastern nor TWA-- the Miami-St. Louis incumbents who favor the imposition of a two-stop restriction on Delta's flights in the market-- has shown that a clear need for this restriction exists.'[22] The Board continued:
 
 
 20
 On the other hand, we see no need to eliminate or amend the two-stop restriction we imposed on Southern's flights between Chicago or St. Louis and Miami or Orlando. This restriction was designed to assure that Southern will concentrate on providing local services between Memphis and its existing Alabama and Florida points, on the one hand, and Miami and Orlando, on the other; it was not imposed to protect the incumbents in the Chicago/St. Louis-Florida markets. Therefore, its retention is in no way inconsistent with our decision not to impose a two-stop condition on Delta's Miami-St. Louis authority, as Southern suggests.[23]
 
 
 21
 While it is clear that the imposition of a two-stop restriction on Southern was grounded on criteria different from those employed in determining whether Delta should be similarly restricted, this disparity is justified by the differing natures of the two carriers. Delta is a long-haul trunk carrier that operates on a non-subsidized basis. In contrast, Southern is basically a short-haul local carrier, whose operations are sustained in part by government subsidies. The Board has some responsibility for safeguarding the financial integrity of a carrier like Southern, whose business failures ultimately burden the public treasury, while the managements of Delta and other non-subsidized carriers can justifiably be allowed greater license in assessing business opportunities and risks, since their mistakes in judgment merely diminish the dividends of their shareholders. Moreover, the Board may reasonably seek to prevent Southern from straying from its basic local markets into long-haul routes, while long-haul service is the principal component of Delta's operations. Therefore, the Board acted reasonably in imposing a two-stop restriction on Southern's St. Louis/Chicago-Orlando/Miami service and not on Delta's.
 
 III. THE LICENSE FEE ISSUE
 
 22
 As a fee for extending Southern's certificate authority, the Board assessed Southern $12,000.[24] This assessment was made pursuant to section 389.25 of the Board regulations, which provides that a license fee shall be paid 'by each carrier which, pursuant to its application, is issued a certificate or has its certificate amended, modified, renewed, or transferred . . ..'[25] In a letter to the Board's managing director dated 21 May 1973, Southern protested that it had already paid the maximum license fee provided by the regulations, $25,000, in connection with the 1969 proceedings. Since the Board's 1973 Order granted Southern essentially the same authority as that awarded in 1969, Southern argued, it would violate the Board's regulations to impose an additional fee.[26] In a letter dated 20 June 1973 the Board informed Southern that its motion for waiver or modification of the license fee had been rejected by an equally divided Board.[27] The letter explained the rejection of Southern's motion with the following statement:
 
 
 23
 The Board is unable to accept Southern's interpretation of the license fee regulations. To begin with, the regulations provide for imposition of a fee each time a carrier's certificate is 'modified' or 'amended' and it is clear that Order 73-2-90 amended Southern's certificate. Thus, the imposition of the license fee falls within the literal terms of the Board's regulations. Moreover, since the essential purpose of the license fee regulations is to enable the Government to recover a portion of its expenses, imposition of the license fee following a wholly new evidentiary proceeding would be consistent with that basic purpose.[28]
 
 
 24
 Since the Board's interpretation of its license fee regulation appears to us not unreasonable, we must defer to that interpretation and not upset the license fee assessment against Southern.[29]
 
 IV. CONCLUSION
 
 25
 The Orders under review are reasonable and supported by substantial evidence; they are therefore
 
 
 26
 Affirmed.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. 294(d)
 
 
 [1]
 Southern Airways, Inc., Route Realignment Investigation (New Route Authority Phase), Docket 18610, Order 73-2-90 (hereinafter Board Order), Joint App. at 18. The Board's Order affirmed the initial decision of the administrative law judge (then hearing examiner), dated 28 February 1972 and reproduced in the Joint Appendix at 182 (hereinafter Initial Decision). Petitions for reconsideration were denied on 23 April 1973 by Order 73-4-92 (hereinafter Order on Reconsideration), Joint App. at 1
 
 
 [2]
 143 U.S.App.D.C. 8, 442 F.2d 730 (1970)
 
 
 [3]
 Southern Airways, Inc., Route Realignment Investigation, Order 69-9-132 (25 Sept. 1969), Joint App. at 113; Supplemental Opinion and Order on Reconsideration, Order 69-11-94 (21 Nov. 1969), Joint App. at 84
 
 
 [4]
 The court's jurisdiction to review Board orders and the applicable standard of review are set out in the Federal Aviation Act 1006, 49 U.S.C. 1486 (1970)
 
 
 [5]
 Delta's petition was contingent on a remand by the court to the Board for reconsideration of the order granting nonstop Memphis-Orlando/Miami authority to Delta, in which case Delta urged that the court order the Board to reconsider its grant of Memphis-Orlando/Miami authority to Southern
 The Board's Order contained further provisions granting Southern nonstop Atlanta-Nashville authority and denying Delta any new authority in that market. No challenge has been raised to these provisions in this suit.
 
 
 [6]
 Board Order, supra note 1, at 2-3, Joint App. at 20-21
 
 
 [7]
 Id. at 4, Joint App. at 22
 
 
 [8]
 49 U.S.C. 1371(d)(1) (1970):
 The Board shall issue a certificate authorizing the whole or any part of the transportation covered by the application, if it finds that the applicant is fit, willing, and able to perform such transportation properly, and to conform to the provisions of this chapter and the rules, regulations, and requirements of the Board hereunder, and that such transportation is required by the public convenience and necessity; otherwise such application shall be denied.
 
 
 [9]
 143 U.S.App.D.C. 330, 339-340, 443 F.2d 745, 754-755 (1971)
 
 
 [10]
 Brief for Petitioner Southern Airways, Inc. at 32
 
 
 [11]
 Order 69-11-94, supra note 3, at 14, Joint App. at 96
 
 
 [12]
 Board Order, supra note 1, at 5, Joint App. at 23
 
 
 [13]
 One of the grounds for this court's remand of the 1969 order was that the projections of Southern's 1970 traffic, costs, and revenue, on which the Board relied in reaching its decision, were of 'questionable reliability.' Delta Airlines, Inc. v. CAB, 143 U.S.App.D.C. 8, 12-14, 442 F.2d 730, 734-736 (1970)
 
 
 [14]
 Id. at 10, 442 F.2d at 732
 
 
 [15]
 See Texas International Airlines, Inc. v. CAB, 144 U.S.App.D.C. 94, 104, 444 F.2d 969, 979 (1971)
 
 
 [16]
 162 U.S.App.D.C. , at - , 497 F.2d 608, at 612-614
 
 
 [17]
 Board Order, supra note 1, at 22, Joint App. at 40
 
 
 [18]
 Order on Reconsideration, supra note 1, at 5-6, Joint App. at 5-6
 
 
 [19]
 Initial Decision, supra note 1, at 61, Joint App. at 230
 
 
 [20]
 Ibid
 
 
 [21]
 The Board applied this policy here when it declined to attach restrictions to Southern's Memphis-Miami/Orlando authority, thus permitting Southern to provide nonstop service along that route if it desires. The Board's willingness to grant this permissive authority may be reconciled with its decision to impose restrictions on Southern's St. Louis/Chicago-Orlando/Miami service. First, as an affirmative justification for its grant of permissive nonstop authority between Memphis and Orlando/Miami, the Board offered the following: 'Permitting Southern to have nonstop authority will serve the public interest by enabling the carrier to enter the market if any serious deficiencies develop in Delta's services; Southern will thus exercise a kind of latent competitive stimulus to Delta's operations.' Board Order, supra note 1, at 6, Joint App. at 24. This 'competitive stimulus' rationale makes sense when applied to the Memphis-Orlando/Miami nonstop market, which is served on a mandatory basis only by Delta. (Eastern has permissive authority but has not exercised it since 1969.) However, the rationale is patently inapplicable to the St. Louis/Chicago-Orlando/Miami single-plane market, which is served by numerous carriers and could apparently sustain the loss of one or more competitors. See text accompanying notes 19-20 supra. Thus, the chance that a carrier like Southern might some day be needed as a stopgap in that market seems slight, and Southern's influence on the market as a 'competitive stimulus' would be minimal. Moreover, Southern could not provide one-stop St. Louis/Chicago-Orlando/Miami service without offering a Memphis-Orlando/Miami nonstop schedule. It follows that the danger inherent in providing the St. Louis/Chicago service includes as a lesser component the risk created by supplying Memphis-Florida nonstop service
 
 
 [22]
 Order on Reconsideration, supra note 1, at 5, Joint App. at 5
 
 
 [23]
 Id. at 5-6, Joint App. at 5-6
 
 
 [24]
 This fee is based on the Board's estimate that Southern's new certificate authority would increase its gross transport revenue during the first year by 5-10 million dollars. Board Order, supra note 1, at 22, Joint App. at 40. The Board regulations on license fees provide for a $12,000 fee for certificate amendments producing gross revenue increases of this magnitude. 49 C.F.R. 389.25(a)(2)(i) (1973)
 
 
 [25]
 49 C.F.R. 389.25(a)(2) (1973)
 
 
 [26]
 Joint App. at 280-83
 
 
 [27]
 Id. at 176
 
 
 [28]
 Id. at 176-77
 
 
 [29]
 Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 413-414, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945); Southwestern Petroleum Corp. v. Udall, 117 U.S.App.D.C. 60, 62, 325 F.2d 633, 635 (1963)